**NSK LTD. and NSK Corporation, Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**The Timken Company, Defendant–Intervenor.**

**Slip Op. 96–53.**
**Court No. 93–12–00830.**

United States Court of International Trade.

March 13, 1996.

Lipstein, Jaffe & Lawson, L.L.P., Washington, DC (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson), for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael S. Kane); of counsel: Linda S. Chang, Attorney–Advisor, U.S. Department of Commerce, Washington, DC, for defendant.

Stewart and Stewart, Washington, DC (Terence P. Stewart, James R. Cannon, Jr., William A. Fennell, Patrick J. McDonough and Olufemi A. Areola), for defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, NSK Ltd. and NSK Corporation (collectively "NSK"), commenced this action challenging certain aspects of the Department of Commerce, International Trade Administration's ("Commerce" or "ITA") final results of administrative review entitled *Final Results of Antidumping Duty Administrative Reviews; Tapered Roller Bearings and Parts Thereof, Finished and Unfin-*

*ished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan ("Final Results"),* 58 Fed.Reg. 64,720 (1993).

## Background

On November 27, 1992, Commerce initiated administrative reviews of tapered roller bearings ("TRBs") from Japan covering the period of 1991 to 1992. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 57 Fed.Reg. 56,318 (1992). Commerce published the preliminary results of these reviews on September 30, 1993. *See Preliminary Results of Antidumping Duty Administrative Reviews; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan,* 58 Fed.Reg. 51,058 (1993).

On December 9, 1993, Commerce published its final determinations concerning the review at issue. *See Final Results,* 58 Fed. Reg. at 64,720. NSK now moves pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record alleging the following actions by Commerce were unsupported by substantial evidence on the agency record and not in accordance with law: (1) refusing to apply a ten percent cap as part of the sum of the deviations methodology; (2) using partial best information available ("BIA") to compute NSK's cost of production; (3) refusing to adjust foreign market value ("FMV") for home market commissions, rebates and discounts; and (4) committing a clerical error.[1] Pls.' Mem. Supp. Mot. J. Agency R. at 10–34.

## Discussion

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on the grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

### 1. *Model Match Methodology*

NSK argues that for purposes of calculating dumping margins, Commerce compared dissimilar merchandise because it did not impose a ten percent limit upon individual bearing deviations as part of its five-criteria model match methodology for selecting the most similar home market TRB model. NSK asserts that the antidumping law mandates that Commerce identify the most similar matches. According to NSK, the absence of a ten percent cap allows for matches between products which are not commercially similar. Pls.' Mem. Supp. Mot. J. Agency R. at 10–14.

Commerce responds that when identical merchandise is not available in the home market for comparison with the merchandise sold to the United States, Commerce must select the "most similar" merchandise based upon the physical characteristics of the merchandise being compared. Def.'s Opp'n to Pls.' Mot. J. Agency R. at 11–12; 19 U.S.C. § 1677(16) (1988).[2] In this review, Com-

1. Plaintiffs abandoned two counts contained in the original complaint. Pls.' Reply to Def.'s Opp'n to Pls.' Mot. J. Agency R. at 20.

2. 19 U.S.C. § 1677(16) (1988) provides:
   The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:
   (A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with,

merce compared home market sales of TRBs to U.S. sales by devising a "sum of the deviations" methodology. Under this approach, Commerce uses five physical characteristics (inner diameter, outer diameter, width, Y factor, and load rating) as criteria for selecting "similar" model matches. Commerce explains that in conjunction with the "sum of the deviations" methodology, it applied a twenty percent cost cap that prevents the matching of United States and home market models whose variable cost of manufacturing differs by more than twenty percent. Commerce argues its actions are within its discretion and in accordance with law. Def.'s Opp'n to Pls.' Mot. J. Agency R. at 11–15.

The Court of Appeals for the Federal Circuit ("CAFC") recently ruled on this issue in *Koyo Seiko Co. v. United Sta es*, 66 F.3d 1204 (Fed.Cir.1995), holding that Commerce's model match methodology, without the ten percent cap, is a permissible approach under 19 U.S.C. § 1677(16). In reaching its conclusion, the CAFC noted that under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), where a statute is silent or ambiguous with respect to a specific issue, the court is limited to determining whether the agency's approach is a permissible construction of the statute. *Koyo*, 66 F.3d at 1209. The CAFC upheld Commerce's construction of the statute stating the following:

Commerce's interpretation is reasonable because there is no evidence that any one of the five criteria should be decisive in determining whether to match a given U.S. TRB with a home-market TRB. By choosing not to apply the ten percent cap, Commerce in essence weighs each of the five criteria equally, which is plainly reasonable.

*Koyo*, 66 F.3d at 1210.

In light of the decision of the CAFC in *Koyo*, the Court finds that Commerce's model match methodology without the ten percent cap is a reasonable approach and consistent with law.

## 2. *Use of Partial Best Information Available to Compute Cost of Production*

In the Final Results, Commerce explained its decision to use partial BIA to calculate NSK's cost of production in the following manner:

First, at verification the Department discovered that NSK maintains standard costs and corresponding variances for the subject merchandise. Even though in our cost questionnaire we specifically requested NSK to describe its cost accounting system(s), NSK never disclosed or described its standard cost system. Second the company failed to adequately demonstrate that the "burden" methodology it uses captures the entire variance (i.e., the untranslated variance account) and that it has captured all production costs in its reported costs of manufacturing. For the models we tested, NSK's reported costs in the submission differ significantly from its standard costs plus variances which NSK maintains in its normal course of business. Therefore, for purposes of these final results, we have retained the adjustments we used in the preliminary results, and, as BIA, have adjusted NSK's submitted costs to reflect standard costs plus variances for the models we tested. For the models we did not test, we increased as BIA, NSK's submitted costs by the highest percentage

and was produced in the same country by the same person as, that merchandise.
  (B) Merchandise—
  (i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,
  (ii) like that merchandise in component material or materials and in the purposes for which used, and
  (iii) approximately equal in commercial value to that merchandise.

  (C) Merchandise—
  (i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
  (ii) like that merchandise in the purposes for which used, and
  (iii) which the administering authority determines may reasonably be compared with that merchandise.

difference between reported costs and standard cost plus variance. 58 Fed.Reg. at 64,727.

■ NSK contends that Commerce erred in resorting to use of partial BIA as opposed to relying on the cost of production and constructed value data reported by NSK. NSK argues that Commerce erroneously concluded that NSK's actual cost system did not accurately represent cost of production. According to NSK, Commerce's calculations are flawed because Commerce used NSK's company-wide variance which includes variances related to non-scope products. NSK explains that only two of the nine factories included in calculating the company-wide variance produce scope merchandise. NSK also emphasizes that Commerce's methodology resulted in the comparison of non-period of review values to actual costs incurred during the period of review. Pls.' Mem. Supp. Mot. J. Agency R. at 16–22.

NSK further points out that Commerce verified the accuracy of NSK's actual costs finding only one discrepancy concerning NSK's material cost calculation. NSK claims that this alleged discrepancy was in fact accounted for in its cost calculation. Id. at 23–26. In addition, NSK maintains that Commerce accepted NSK's actual cost system in past reviews. Id. at 27–28.

In the alternative, NSK submits that if the Court upholds Commerce's resort to partial BIA, the Court should instruct Commerce to use variances based only on scope products manufactured during the period of review. Id. at 28–29.

In rebuttal, Commerce asserts that it discovered deficiencies in NSK's submission concerning actual costs and, therefore, recalculated NSK's costs of production. According to Commerce, NSK did not explain why the costs of production reported in the questionnaire differed from the costs of production calculated using the information reported in NSK's accounting records. Def.'s Opp'n to Pls.' Mot. J. Agency R. at 17–18. Commerce contends that NSK's failure both to disclose records of variance costs contained in its accounting system, and to explain the discrepancy between the accounting

records and the questionnaire, justified using BIA. Id. at 19–21.

Commerce also defends its use of a company-wide variance as consistent with the policy that BIA is a rule of adverse inference. Commerce argues that using the costs contained in NSK's submission would reward NSK for failing to comply with Commerce's requests for information. Id. at 22–23.

Defendant-intervenor, The Timken Company ("Timken"), supports Commerce's decision to rely on partial BIA because of NSK's failure to provide information requested by Commerce concerning NSK's standard cost system until the last day of verification. Def.-Int.'s Opp'n to Pls.' Mot. J. Agency R. at 10–12. Timken also agrees with Commerce's use of a company-wide variance because Commerce did not have sufficient time to verify the group variances identified by NSK on the last day of verification. Id. at 13.

Section 1677e(c) of Title 19, United States Code, states that Commerce "shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available." In addition, Commerce's regulations instruct the Secretary to use BIA whenever Commerce:

(1) Does not receive a complete, accurate, and timely response to the Secretary's request for factual information; or

(2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted.

19 C.F.R. § 353.37(a) (1993).

NSK's position that Commerce should not have resorted to use of BIA is inconsistent with the purpose of BIA as "an investigative tool" which Commerce "may wield as an informal club over recalcitrant parties or persons whose failure to cooperate may work against their best interest." *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191 (Fed.Cir.1990) (quoting *Atlantic Sugar Ltd. v. United States,* 744 F.2d 1556, 1560 (Fed. Cir.1984)). The record reveals that NSK failed to provide Commerce with all of the requested information. The fact that Com-

merce may have only found one discrepancy in NSK's actual cost system does not support the argument that Commerce should have relied on the actual cost system. Commerce specifically requested in the cost questionnaire that respondents describe all cost accounting systems used for the bearings under review.[3] In response, NSK reported its actual cost system and did not make any reference to its budgeted cost system maintained for individual bearings. *See Corrections to Cost Verification Report*, C.R. Document No. 126, Fiche 300, Frame 9.[4] Even if NSK genuinely believed that the budgeted cost system should not have been reported in response to the questionnaire, NSK should have presented the information in response to Commerce's request during verification for documentation concerning the amount at which pre-selected bearings were valued for inventory purposes during the period of review. *See Verification Report on the Cost of Production and Constructed Value of NSK Ltd. and NSK Corporation ("Verification Report")*, C.R. Document No. 107, Fiche 292, Frame 32. Instead, NSK stated that its inventory records do not include the values of individual bearings. *Id.* NSK does not offer a satisfactory explanation for its decision to wait until the last day of verification to submit records of variance costs that allow it to convert standard costs to actual costs for specific product types.[5] *See Verification Report*, C.R. Document No. 107, Fiche 292, Frames 32–33. NSK's assertion that the information it submitted to Commerce provided a sufficient representation of NSK's cost of manufacturing misses the point that "[i]t is Commerce, not the respondent, that determines what information is to be provided for an administrative review." *Ansaldo Componenti, S.p.A. v. United States*, 10 CIT 28, 37, 628 F.Supp. 198, 205 (1986). NSK's failure to submit all of the information requested in a timely manner justified Commerce's resort to partial BIA.

█ The next issue is whether Commerce's selection of BIA was proper. Because the relevant statute does not explicitly state what type of information constitutes

---

3. The questionnaire asked for the following information concerning cost accounting:

Describe the cost accounting system used by your company for the bearings under review. If you have more than one accounting system, do this for each factory, as necessary. Your description should be provided as a narrative, with flow charts included as appropriate. The description should include, but not be limited to, discussions of the following items:

1. A general description of the company's cost accounting method (*e.g.*, job order, process, actual, or standard costing);
2. If applicable, a description of the company's use of standard costs, including:
a. variances of actual costs from standard, and the period for which the variances are calculated and recorded;
b. the method of distribution of the variances and the basis of each distribution. Note any differences between the cost accounting and financial accounting treatment of these variances;
c. the methods used to develop the standards;
d. the frequency of revisions of the standard costs and the date of the last revision; and
e. how the standard cost system is used for the financial accounting system;

All variances during the period of review must be allocated for the submission. Any significant or unusual cost variances during the period of review should be explained.

*Antidumping Request for Information*, Section VI at 4.

4. The public record of this administrative review is designated "P.R." and the confidential record is designated "C.R."

5. The Court also finds NSK's assertion that the budgeted cost system is not really a standard cost accounting system unpersuasive. *See* Pls.' Reply Mem. Supp. Mot. J. Agency R. at 11–14. This argument is inconsistent with NSK's own acknowledgment in the *Corrections to Cost Verification Report* that it has "considered using this system to respond to the cost section of the questionnaire." C.R. Document No. 126, Fiche 300, Frame 9. NSK's basic reason for deciding against this approach is that "the BC [budgeted cost] system is a cumbersome approach for providing responses to the Department's questionnaire." C.R. Document No. 126, Fiche 300, Frame 10. NSK provides some explanation as to why this system is burdensome to report which the Court will not quote due to the proprietary nature of the information, but the Court remains unconvinced that the budgeted cost system does not represent a standard cost system. If the budgeted cost system does not in some manner represent a standard cost system, there would be no reason for NSK to consider using this system to respond to the cost section of Commerce's questionnaire.

"best" information, Congress "explicitly left a gap for the agency to fill." *Allied–Signal Aerospace Co. v. United States*, 996 F.2d 1185, 1191 (Fed.Cir.1993) (quoting *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2782, 81 L.E.2d 694). Accordingly, Commerce's determination as to what constitutes the best information available must be accorded considerable deference. *Allied–Signal*, 996 F.2d at 1191. It is also important to note that the information used by Commerce does not actually have to be the "best" information. In *N.A.R., S.p.A. v. United States*, 14 CIT 409, 416, 741 F.Supp. 936, 942 (1990), the Court stated that "[w]hen use of best information is challenged, the question is not whether the ITA has chosen the 'best' of all available information, but rather whether the information chosen by the ITA is supported by substantial evidence on the record" (citing *Chinsung Indus. Co. v. United States*, 13 CIT 103, 106–07, 705 F.Supp. 598, 601 (1989)). The Court further noted that "best information available 'is not necessarily accurate information, it is information which becomes usable because a respondent has failed to provide accurate information.'" *N.A.R.*, 14 CIT at 416, 741 F.Supp. at 942 (quoting *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT 13, 28, 704 F.Supp. 1114, 1126 (1989), *aff'd*, 901 F.2d 1089 (Fed.Cir.), *cert. denied*, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990)).

■ Commerce is permitted to use adverse partial BIA in cases where the respondent has not substantially complied with information requests. Neutral BIA is "applied only to a respondent who has substantially complied and there is also an inadvertent or unavoidable gap in the record, or when a minor or insignificant adjustment is involved." *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States*, 18 CIT ——, ——, 865 F.Supp. 857, 866 (1994). NSK's failure to report its budgeted cost system's not substantial compliance and the adjustments required are more than minimal. In *Ad–Hoc*, however, the Court remanded the issue of whether Commerce selected BIA which resulted in "needlessly distortive" margins where the plaintiff demonstrated that Commerce's selection of BIA resulted in a margin of over 1000%. In contrast, NSK fails to present any evidence that the use of a company-wide variance or non-period of review data resulted in needlessly distortive margins. As such, the Court finds that Commerce's selection of BIA is supported by substantial evidence on the agency record.

### 3. *Treatment of Home Market Commissions, Rebates and Discounts*

■ In the Final Results, Commerce disallowed certain adjustments to FMV for home market commissions, rebates and discounts. 58 Fed.Reg. at 64,723. Specifically, Commerce addressed NSK's claimed adjustments as follows:

(1) Discounts, rebates and certain commissions. At verification the Department discovered that actual amounts for total sales to two distributors differed from the amounts used in worksheets for the response. Since the Department verified the corrected amounts and the discrepancies were "small", NSK argues that, although company officials were unable to explain the source of the error, the Department should either accept the corrected data or ignore the *de minimus* errors....

(2) Commissions for delivery on behalf of NSK. NSK argues that since the Department verified the corrected commission amounts, and since most of the errors were unfavorable to NSK, the Department should either accept NSK's corrected information or make no adjustment to the data.

. . . .

(4) Commissions for repurchase for urgent delivery. NSK objects to the Department's denial of this adjustment for commissions because NSK incurred the expense in question and because the Department verified the amount of commissions paid. Moreover, NSK asserts that the Department has accepted the method of allocation in previous reviews....

. . . .

*Department's Position:* As for (1), NSK officials were unable to explain the source of the error, which affected a substantial percentage of its distributors. Therefore,

we have disallowed all adjustments which were based on total sales to the distributors associated with the errors. As for (2), we disagree with NSK. The amounts of commissions paid to distributors in the home market were both understated and overstated, compromising the integrity of the response. Although NSK submitted corrected information, because NSK officials could not explain why the response was inaccurate, we have disallowed these claimed adjustments.... As for (4), while we recognize that the expenses were in fact incurred, we do not accept NSK's allocation methodology. NSK allocated commission amounts over sales of the related distributors, who bore no expense in the consummation of the new sales, rather than over the sales to the ultimate customer. To associate the expenses with sales to the distributors is distortive, since NSK did not incur the expenses in connection with these sales.

*Id.*

NSK concedes that it submitted erroneous information concerning rebates, discounts and commissions paid to two unrelated customers but argues that Commerce should not have disallowed the adjustment to FMV. According to NSK, it submitted the correct information at verification and the necessary changes were *de minimis.* Pls.' Mem. Supp. Mot. J. Agency R. at 32. Similarly, NSK contends that Commerce should have adjusted FMV for commissions for delivery on behalf of NSK because, even though NSK did not accurately report the commissions, it corrected its mistakes at verification. *Id.* at 32–33. Finally, NSK submits that Commerce should have allowed an adjustment to FMV for NSK's repurchase for urgent delivery commissions which, according to NSK, were reasonably reported and allocated. *Id.* at 33–34.

In response, Commerce claims that the discrepancies found in NSK's questionnaire response were more than *de minimis.* Commerce contends that it may not have denied the adjustment to FMV for the commissions, rebates and discounts paid to the two unrelated distributors had NSK been able to explain why the reporting discrepancies occurred. Def.'s Opp'n to Pls.' Mot. J. Agency R. at 26–27. Commerce also maintains that NSK's erroneous reporting of its delivery commissions undermined the integrity of NSK's response since NSK was unable to explain the lack of correspondence between the reported information and NSK's records. *Id.* at 25–26. Finally, Commerce submits that while it verified NSK's urgent delivery commissions, it discovered that the commissions were "allocated across the sales of related distributors who bore no expense with respect to the consummation of the new sales." *Id.* at 24–25.

This Court has acknowledged that "[r]espondents have the burden of creating an adequate record to assist Commerce's determinations." *Nachi–Fujikoshi Corp. v. United States,* 19 CIT ——, ——, 890 F.Supp. 1106, 1111 (1995) (citing *Tianjin Mach. Import and Export Co. v. United States,* 16 CIT 931, 936, 806 F.Supp. 1008, 1015 (1992)). The Court further noted in *Nachi* that Commerce has been given broad discretion in making adjustments. 19 CIT at ——, 890 F.Supp. at 1111 (citing *Smith–Corona Group Consumer Prods. Div., SCM Corp. v. United States,* 713 F.2d 1568, 1577 n. 26 (Fed.Cir. 1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984)). In *Nachi,* the Court upheld Commerce's decision not to adjust FMV for a certain rebate because the claim was unsubstantiated. In the case at bar, NSK admits that it provided incorrect information in its questionnaire response concerning delivery commissions on behalf of NSK, and rebates, discounts and commissions paid to two distributors. Although NSK corrected this information at verification, it did not provide any reasons for the mistakes contained in its response to Commerce's request for information. *See Post Verification Submission of NSK Ltd. and NSK Corporation,* P.R. Document No. 221, Fiche 135, Frames 5–7. An explanation concerning the source of the error would have allowed Commerce to determine whether, in general, the information submitted by NSK was accurate and reliable. In light of these unexplained errors, Commerce acted reasonably in denying any adjustment to FMV.

Commerce also acted reasonably in rejecting NSK's urgent delivery commissions once it determined that the commissions were not directly related to the sales at issue. Commerce's regulations provide the following guidelines concerning adjustments to FMV:

> (a) *In general.* (1) In calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared if the Secretary is satisfied that the amount of any price differential is wholly or partly due to such difference. *In general, the Secretary will limit allowances to those circumstances which bear a direct relationship to the sales compared.*

19 C.F.R. § 353.56 (1993) (emphasis added). It is well-established that the respondent bears the burden of showing the existence of a direct relationship between the commissions paid and the sales under consideration. *NSK Ltd. v. United States,* 17 CIT 1185, 1187–88, 837 F.Supp. 437, 439–40 (1993); *see also Comitex Knitters, Ltd. v. United States,* 16 CIT 817, 824, 803 F.Supp. 410, 416 (1992). NSK's allocation methodology failed to establish a direct relationship between the urgent delivery commissions and the sales under consideration. Therefore, Commerce's decision to deny the adjustment to FMV for NSK's urgent delivery commissions is supported by substantial evidence on the agency record.

**4. *Clerical Error***

NSK contends that at lines 273 and 287 of the computer program, unique home market parts are not identified because the language "BY HMPART" has been omitted. Pls.' Mem. Supp. Mot. J. Agency R. at 34. Commerce concedes that the language "BY HMPART" was inadvertently omitted from the computer program and agrees that a remand is necessary to correct the error. Def.'s Opp'n to Pls.' Mot. J. Agency R. at 27. Defendant-intervenor Timken submits that the error exists in more lines of the computer program than those enumerated by NSK. Def.–Int.'s Opp'n to Pls.' Mot. J. Agency R. at 25–26.

Upon a review of the record, the Court agrees with the parties that a remand is necessary to correct the clerical error at issue to the extent necessary.

### Conclusion

NSK's motion for judgment upon the agency record is granted to the extent that this case is remanded to correct the clerical error concerning home market parts. Commerce's Final Results, to the extent challenged herein, are sustained in all other respects.

The remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses are due within thirty (30) days thereafter; any rebuttal comments are due within fifteen (15) days of the date that responses or comments are due.

### ORDER

This case having been duly submitted for decision following plaintiffs' motion for judgment on the agency record, and the Court, after due deliberation, having rendered a decision herein; now, therefore, in accordance with said decision, it is hereby

**ORDERED** that plaintiffs' motion is granted to the extent that this case is remanded to the Department of Commerce, International Trade Administration, to correct the clerical error concerning home market parts in all of the lines in which the error exists; and it is further

**ORDERED** that Commerce's determination is affirmed in all other respects; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter; any rebuttal comments are due within fifteen (15) days of the date that responses or comments are due.