**KOYO SEIKO CO., LTD. and Koyo Corporation of U.S.A., Plaintiffs,**

v.

**UNITED STATES, The United States Department of Commerce, Defendants,**

**The Timken Company, Defendant–Intervenor.**

Slip Op. 96–101.
Court No. 93–12–00795.

United States Court of International Trade.

June 19, 1996.

---

Powell, Goldstein, Frazer & Murphy (Peter O. Suchman, Susan P. Strommer and Elizabeth C. Hafner), Washington, D.C., for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael S. Kane); of counsel: Linda Chang, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., William A. Fennell, Lane S. Hurewitz and Olufemi A. Areola), Washington, D.C., for defendant-intervenor.

**OPINION**

TSOUCALAS, Judge:

At issue in this action are certain aspects of the final determinations of the United States Department of Commerce, International Trade Administration ("Commerce"), entitled *Final Results of Antidumping Duty Administrative Reviews; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan* ("*Final Results*"), 58 Fed.Reg. 64,720 (Dec. 9, 1993). The Final Results are the culmination of four administrative reviews which were conducted simultaneously and cover the 1990–91 and 1991–92 periods of review ("POR"). Plaintiffs, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"), challenge Commerce's final dumping margin determinations, alleging that Commerce improperly (1) rejected Koyo's proposed ten percent cap on the permissible deviations in its model matches; (2)

denied Koyo a price-based level-of-trade adjustment to sales; (3) calculated adjustments for United States discounts and sales allowances using best information available ("BIA") instead of Koyo's reported customer-specific data; (4) refused to add direct selling expenses to foreign market value ("FMV"); (5) applied BIA to Koyo's cost of manufacturing ("COM"), adjusting reported related-party transfer prices in calculating constructed value ("CV"); (6) used individual cups and cones as comparison models notwithstanding that these tapered roller bearing ("TRB") components were sold only as sets; and (7) used sales of sample and obsolete products for comparison purposes. Koyo moves for judgment on the administrative record pursuant to Rule 56.2 of the Rules of the Court, alleging that the Final Results are unsupported by substantial evidence on the administrative record and not in accordance with law. Mem. Pls.' Supp. Mot. J. Agency R.

*Background*

The preliminary determinations in the four administrative reviews at issue here were published in *Preliminary Results of Antidumping Duty Administrative Reviews; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan,* 58 Fed.Reg. 51,058 (Sept. 30, 1993).

The Final Results for the four reviews are published in 58 Fed.Reg. at 64,720.[1]

*Discussion*

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable

---

1. Court No. 93–12–00796 challenges Commerce's Final Results with respect to entries made during the October 1, 1990 through September 30, 1991 review period of tapered roller bearings ("TRBs") of over 4 inches. Court No. 93–12–00795 challenges the same category of entries for the identical period of time in 1991/92. Court No. 93–12–00798 challenges the treatment afforded 0–4 inch TRBs during the August 1, 1990 through September 30, 1991 POR and Court No. 93–12–00797 makes the same challenge for the POR October 1, 1991 through September 30, 1992.

mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

### 1. *Model–Match Methodology*

In order to compare the United States price ("USP") and FMV of the merchandise in question, Commerce must determine what merchandise is "such or similar" to that sold in the United States. *See* 19 U.S.C. § 1677(16) (1988). In conjunction with a twenty percent cost cap that prevents matching of United States and home market models whose variable cost of manufacturing differs by more than twenty percent, Commerce here utilized the five-criteria model-match methodology, also referred to as the "sum of the deviations" methodology. Commerce rejected the use of an additional ten percent cap upon the deviations of any one criteria when selecting the home market TRB model most similar to the United States model. *Final Results*, 58 Fed.Reg. at 64,721.

Koyo challenges Commerce's approach. According to Koyo, use of the ten percent limit on the permissible deviation of the individual criteria is imperative because "TRB models may be very similar in four of the five physical criteria and yet still be commercially very dissimilar products if they differ significantly (i.e., by more than ten percent) in the remaining criterion." Mem. Supp. Pls.' Mot. J. Agency R. at 18.

In the Final Results, Commerce expressed that Koyo's proposed ten percent cap in conjunction with its sum of the deviations model-match methodology would "eliminate matches of essentially comparable merchandise" because "the best overall match could be eliminated simply because a single physical criterion deviated by more than 10 percent" in one or more physical criteria.[2] *Final Results*, 58 Fed.Reg. at 64,721. Adhering to this position, Commerce submits that its rejection of the ten percent cap in these reviews was a reasonable exercise of its statutory mandate. Def.'s Opp. Pls.' Mot. J. Agency R. at 11–13.

In *Koyo Seiko Co. v. United States*, 66 F.3d 1204 (Fed.Cir.1995), Commerce had used the sum of the deviations methodology for matching U.S. TRBs with home market TRBs, without the ten percent cap on the deviation of any one criteria. Commerce had also "eliminated from its analysis any potential comparisons for which the difference in the variable costs between the home-market model and the target U.S. model exceeded twenty percent." *Koyo Seiko*, 66 F.3d at 1210. The United States Court of Appeals for the Federal Circuit ("CAFC") upheld Commerce's use of the sum of the deviations model-match methodology without a ten percent cap, finding it a permissible and reasonable construction of the statute. *Id.* at 1208–11. *See* 19 U.S.C. § 1677b (1988); 19 U.S.C. § 1677(16). Therefore, the Court rejects Koyo's argument and defers to Commerce's choice of model-match methodology without the ten percent cap to yield "such or similar" merchandise. *See NSK Ltd. v. United States*, 19 CIT ——, ——, Slip Op. 95–204 at 6–7, 1995 WL 761314 at *2–3 (Dec. 18, 1995); *NSK Ltd. v. United States*, 19 CIT ——, ——, 919 F.Supp. 442, 445 (Mar. 13, 1996).

### 2. *Comparison of Sales Across Different Levels of Trade*

In the United States and in Japan, Koyo's TRB sales to original equipment manufacturers ("OEM") customers and aftermarket ("AM") customers constitute sales at two different levels of trade. Commerce compared products sold at the different levels of trade but denied Koyo a level-of-trade adjustment. Although Commerce determined that Koyo demonstrated that net prices vary between levels of trade, it found that Koyo "did not

---

**2.** The five physical criteria used as selection criteria in the "sum of the deviations" methodology are: inner diameter, outer diameter, width, Y factor and dynamic load rating. Def.'s Opp. to Pls.' Mot. for J. on the Agency R. at 11.

provide evidence that this variation in price was the result of different costs incurred at different levels of trade." *Final Results*, 58 Fed.Reg. at 64,731.

Koyo submits that its dumping margins were artificially inflated because it was denied a level-of-trade adjustment to foreign market prices. Mem. Supp. Pls.' Mot. J. Agency R. at 9–10. In particular, Koyo asserts that Commerce's refusal to grant it a level-of-trade adjustment on any basis other than differences in selling costs ignores economic reality because "a product can have a higher *value* in the marketplace depending on the level of trade at which it is sold, completely apart from the difference in actual selling expenses." *Id.* at 21. Among other record evidence, Koyo relies heavily for support on a study by Dr. Robert E. Litan entitled *Level of Trade Adjustments: An Economic Analysis [1990–91 Administrative Review of Koyo Seiko Co., Ltd. Tapered Roller Bearings From Japan]* ("Litan Study") contained in Koyo's Supplemental Questionnaire Response, June 10, 1993 submission, Confidential R. Doc. No. 71, Exhibit 1 at 4.[3] *Id.* at 22–24. Koyo represents that its price differentials were calculated based on prices at each trade level net of all charges and adjustments, including circumstances of sale adjustments. Thus, Koyo claims the price differentials are attributable solely to differences in levels of trade as opposed to other factors. *Id.* at 23–24. Koyo argues that 19 C.F.R. § 353.58 requires that Commerce make appropriate adjustments for differences affecting price, not cost, comparability. *Id.* at 24–25. Koyo seeks a price-based level-of-trade adjustment, or at a minimum, an explanation of why its calculation of the price differential is unacceptable. *Id.* at 27.

Commerce refutes Koyo's arguments, asserting that Koyo has simply adduced evidence of its price structure, but failed to satisfy its burden of demonstrating entitlement to a level-of-trade adjustment. Def.'s Opp. Pls.' Mot. J. Agency R. at 14–18. Conceding only that the Litan Study establishes the existence of price differences at the two

trade levels at issue, Commerce points out that the study fails to establish that the price differentials are attributable solely to differences in levels of trade. *Id.* at 17–18.

Koyo bears the burden of demonstrating entitlement to the claimed adjustment. *See NTN Bearing Corp. of Am. v. United States*, 19 CIT ——, ——, 903 F.Supp. 62, 70 (1995). *See also Fundicao Tupy S.A. v. United States*, 12 CIT 6, 7–8, 678 F.Supp. 898, 900 (1988), *aff'd*, 859 F.2d 915 (Fed.Cir.1988).

■ The Court agrees with Commerce that Dr. Litan's calculations demonstrate price differentials reflecting something other than level of trade. Def.'s Opp. Pls.' Mot. J. Agency R. at 18. Even if the Litan Study accurately calculated price differentials net of all charges and adjustments, it does not establish that Koyo's price differentials on sales to its OEM and AM customers are attributable solely to differences in level of trade. *See* Litan Study, Confidential R. Doc. No. 71. Under the circumstances, Commerce properly denied Koyo's claimed level-of-trade adjustment.

In addition, the Court has stated that

> when Commerce compares one discrete level of trade in one market with another discrete level of trade in the other market, adjustments will be made if claimant sufficiently proves that any difference in price in the two markets for an identical product is due to quantity-discounts given to larger volume buyers.

*NAR S.p.A. v. United States*, 13 CIT 82, 84, 707 F.Supp. 553, 557 (1989). *See also* 19 U.S.C. § 1677b(a)(4). In the case at bar, Koyo merely argues that the differing economic value of its product is related to the prices charged by its customers to their end customers buying in large or small quantities. Mem. Supp. Pls.' Mot. J. Agency R. at 23–26. *See also* Litan Study at 8–9. Koyo proffers no evidence demonstrating that discounting of quantity sales affected price.

---

**3.** Koyo also cites Confidential R. Doc. No. 9 (Koyo's 1990/91 Section IV Questionnaire Response, dated March 27, 1992, at 8–14 and Exhibit A–9) and Confidential R. Doc. No. 40

(Koyo's 1991/92 Section IV Questionnaire Response, dated March 30, 1993, at 7–13 and Exhibit A–9).

Koyo also argues that market power and market pressures are part of the differing value of its product and should be considered. Mem. Supp. Pls.' Mot. J. Agency R. at 23–27. However, Koyo's "value" argument is unavailing. "The ready availability of cost data that can be employed without extensive complex econometric analysis supports the reasonableness of [Commerce's] decision to rely on cost. Cost may be the only *practical* way to administer the statute." *Smith–Corona Group v. United States,* 713 F.2d 1568, 1577 n. 27 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984); *see Daewoo Elecs. Co. v. International Union of Elec., Electrical, Technical, Salaried & Mach. Workers, AFL–CIO,* 6 F.3d 1511, 1518 (Fed.Cir.1993), *cert. denied sub nom. International Union of Elec., Electrical, Technical, Salaried & Mach. Workers, AFL–CIO v. United States,* — U.S. —, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994). Similarly, in this case, cost may be the only practical way of determining whether to grant a level-of-trade adjustment.

The Court has previously upheld Commerce's denial of a level-of-trade adjustment where plaintiff sought a trade level adjustment for price differentials and/or an explanation of why the claim was inadequate but failed to quantify its claimed price differentials attributed to differences in levels of trade. *See NTN Bearing Corp. of Am. v. United States,* 19 CIT —, —, 905 F.Supp. 1083, 1093–94 (1995); *NTN Bearing Corp. of Am. v. United States,* 17 CIT 1149, 1154, 835 F.Supp. 646, 650 (1993). *See also NTN Bearing Corp. of Am. v. United States,* 20 CIT —, —, 924 F.Supp. 200, 208–09 (1996).

For the reasons noted above, Commerce was justified in denying Koyo a level-of-trade adjustment and its decision is sustained.

### 3. Koyo's United States Discounts and Sales Allowances

Koyo reported United States discounts and sales adjustments on a customer-specific basis. Because "Koyo's U.S. discounts and sales allowances were not reported on a transaction-specific basis, [Commerce] assigned, as BIA, the highest percentage discount or sales allowance reported for any U.S. sale to all sales that received a discount or sales allowance." *Final Results,* 58 Fed. Reg. at 64,725.

Koyo challenges Commerce's application of BIA in place of Koyo's reported data. Koyo argues that Commerce accepted customer-based data in previous reviews and gave no notice prior to the Final Results that it was reversing established practice. According to Koyo, the supplemental questionnaire from Commerce in these reviews indicated that Commerce would continue to accept Koyo's customer-specific rates. Koyo also argues that Commerce never requested data on U.S. discounts and allowances calculated on a different basis. Mem. Supp. Pls.' Mot. J. Agency R. at 27–33.

■ Commerce concedes that it did have an established practice of accepting discounts and sales allowances data reported on a customer-specific basis and that it did not request additional data of Koyo or issue a deficiency notice. Under these circumstances, Commerce requests "a remand for the purpose of recalculating the adjustments using Koyo's customer-specific data." Def.'s Opp. Pls.' Mot. J. Agency R. at 19.

Accordingly, this case is remanded to Commerce to recalculate adjustments for United States discounts and selling expenses using the customer-specific data reported by Koyo which fully responds to Commerce's request for information.

### 4. Deduction of Direct Selling Expenses From United States Price

Koyo further claimed that Commerce erred in adjusting for United States direct selling expenses by deducting them from United States price in exporter's sales price transactions rather than adding them to foreign market value. Koyo argued that the Court has repeatedly held that direct selling expenses should be added to foreign market value. Mem. Supp. Pls.' Mot. J. Agency R. at 33–35. However, Koyo now withdraws its claim in light of *Koyo Seiko Co. v. United States,* 36 F.3d 1565 (Fed.Cir.1994). Pls.' Reply Br. at 18.

As Koyo correctly recognizes, the CAFC has since upheld Commerce's approach of deducting direct selling expenses from USP, stating:

> In an exporter's sales price transaction, after an initial exporter's sales price is calculated, that value is adjusted, *inter alia*, pursuant to section 1677a(e)(2) [ (1988) ] by deducting therefrom all selling expenses (both direct and indirect) incurred in making U.S. sales. Then, in determining an initial foreign market value, appropriate sales are identified in the home market or third country pursuant to 19 U.S.C. § 1677b(a). Next. the initial foreign market value is adjusted, *inter alia*, by deducting therefrom a "circumstances of sale" amount to account for "any difference between the United States price and the foreign market value," 19 U.S.C. § 1677b(a)(4), ·for example, direct selling expenses incurred in making home market sales. In this way, the section 1677b(a)(4) adjustment to foreign market value counterbalances the section 1677a(e)(2) adjustment to exporter's sales price. As a result, the two parameters may be compared on equivalent terms.

*Koyo Seiko Co. v. United States,* 36 F.3d at 1573 (Fed.Cir.1994).

In light of the CAFC's decision in *Koyo Seiko,* 36 F.3d at 1565, the Court sustains Commerce's deduction of Koyo's direct selling expenses from USP as comporting with current judicial precedent.

### 5. *Use of Partial BIA to Calculate Constructed Value for the 1990/91 Review*

In the 1990/91 Final Results, Commerce concluded that Koyo's transfer prices for work done by a related-party subcontractor were less than the subcontractor's cost of production.[4] Consequently, Commerce used partial BIA to calculate Koyo's transfer price portion of constructed value.[5] As partial BIA, Commerce increased Koyo's reported material costs by the average difference between reported related-party transfer prices that were below the actual cost of production ("COP") and the actual costs of production of these models. *Final Results,* 58 Fed.Reg. 64,728. Koyo disagrees.

Koyo first contends that Commerce's resort to BIA for the purpose of calculating CV was improper. Specifically, Koyo argues that because Commerce found that for two TRB models the transfer prices for work done by a related subcontractor were less than the subcontractor's cost of production, Commerce erroneously assumed that the transfer prices of the majority of the U.S. models on which CV was calculated were also below cost of production and adjusted Koyo's COM to account for the understatement. Koyo submits that its transfer prices on average *exceeded* cost of production. According to Koyo, application of BIA increased its COM, inflating CV for every U.S. product, and overstating its dumping margins every time a U.S. sale was compared to CV. Mem. Supp. Pls.' Mot. J. Agency R. at 35–36. Koyo wants its 1990/91 margins recalculated without an adjustment to COM. *Id.* at 38.

Second, Koyo claims that Commerce's choice of BIA was flawed. If Commerce is found to have properly applied BIA, Koyo proposes that the BIA factor be recalculated taking into account transfer prices above, as well as below, COP. That is, Koyo wants Commerce to determine the difference between what Koyo paid for all the models tested and what it should have paid, as a percentage of the transfer prices for all these models, not just the two models found to be below COP. *Id.* at 39–40. In addition, Koyo contends that Commerce "calculated a COM adjustment for all models based on the as-

---

4. When a subcontractor is a related party, the price that the manufacturer pays the subcontractor is the "transfer price." Where Commerce determines that the transfer price is not reflective of fair market price, it may disregard it and apply, as BIA, an amount that reflects what the amount would have been had the transaction occurred between unrelated persons. *See* 19 U.S.C. § 1677b(e)(2); 19 C.F.R. § 353.50(c) (1990).

5. When Commerce bases FMV on CV, it first calculates the COM and then adds amounts for general expenses and profits. *See* 19 C.F.R. § 353.50(a) (1990). COM includes the cost of services or materials subcontracted to other manufacturers.

sumption that the facts relating to the two 'understated' models applied to *every single model* sold by Koyo in the U.S. market." *Id.* at 40. Koyo concedes that Commerce adjusted the BIA factor to limit its application to the percentage of Koyo's total costs attributable to subcontracting. However, Koyo suggests that Commerce should have further limited its application to costs attributable only to subcontracting *by related parties.* *Id.*

Defendant-intervenor, The Timken Company ("Timken"), contends that "the best measure of the proper adjustment for below-cost input prices is the difference between transfer prices and cost for those below-cost parts." Timken's Opp. Pls.' Mot. J. Agency R. at 25. Timken also asserts that "[a]bove-cost transactions have no logical relationship to the task and if used would produce an arbitrary result." *Id.*

In response, Commerce argues that its resort to partial BIA in calculating CV was justified because Koyo's reported information was inaccurate, incomplete, and misleading. Def.'s Opp. Pls.' Mot. J. Agency R. at 20.

▆ The Court must agree with Commerce on this issue. Commerce instructed Koyo to only use related-party transfer prices to calculate costs of material if the transfer prices were higher than the related supplier's actual cost of production. *See* Public R. Doc. No. 34, Cost Questionnaire for 1990/91 review, sent to Koyo on Jan. 23, 1992, Section VI at 7–8. Koyo's use of a transfer price, therefore, implicitly represents that the transfer price is, in fact, higher than the actual cost of production. Verification proved this not to be the case. *See* Confidential R. Doc. No. 172, Memorandum from Neal Halper to Marie E. Parker, dated Dec. 1, 1993, at 1. Therefore, even if Koyo made no misrepresentations with respect to some of the transfer prices Commerce tested and the average transfer price of the sample examined exceeded the average cost of production, the Court cannot encourage misleading reporting. To do so would defeat the point of the BIA rule, *i.e.,* to prevent respondents "from controlling the results of the investigation by providing partial information." *Pistachio Group of the Ass'n of Food*

*Indus. v. United States,* 11 CIT 668, 679, 671 F.Supp. 31, 39–40 (1987). In addition, "[i]t is Commerce, not the respondent, that determines what information is to be provided for an administrative review." *NSK Ltd. v. United States,* 19 CIT ——, ——, 910 F.Supp. 663, 671 (1995), citing *Ansaldo Componenti, S.p.A. v. United States,* 10 CIT 28, 37, 628 F.Supp. 198, 205 (1986). *See also N.A.R., S.p.A. v. United States,* 14 CIT 409, 415, 741 F.Supp. 936, 941 (1990).

Koyo does not deny that, on the samples Commerce tested for reliability, transfer prices for work done by a related-party subcontractor were in fact misrepresented. Nor does Koyo offer any explanation for this deficiency. Since the sampling of reported prices examined was unreliable, Commerce reasonably abandoned confidence in the accuracy of Koyo's reported data and applied partial BIA.

Further, Commerce requested data on the *actual,* not the average, transfer prices. The Court must grant Commerce considerable deference in choosing BIA. It is within Commerce's discretion to decide what constitutes best information available in a particular case. *Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1191–92 (Fed. Cir.1993). Commerce may reject respondent's data *in toto,* even if "some of it had not been proven inaccurate," if, as in this case, the information, or part thereof, proves unreliable. *Chinsung Indus. Co. v. United States,* 13 CIT 103, 109, 705 F.Supp. 598, 602 (1989). The Court will not reward Koyo by requiring Commerce to use the favorable related-party transfer prices contained in Koyo's deficient submission, notwithstanding that the deficiency did not extend to all of the transfer prices tested. If Koyo were to benefit as a result of misrepresenting its reported information, the incentive to respond accurately would be eliminated and "alleged unfair traders would be able to control the amount of antidumping duties by selectively providing [Commerce] with information." *Olympic Adhesives, Inc. v. United States,* 899 F.2d 1565, 1572 (Fed.Cir.1990); *accord Allied–Signal Aerospace,* 996 F.2d at 1190–92. In addition, Koyo points to no record evidence that would allow Commerce to fully

determine which TRB models involved related-party contracting.

In sum, the Court finds that Commerce's rejection of Koyo's related-party transfer prices in favor of partial BIA, for the purpose of calculating Koyo's transfer price COM portion of constructed value, was in accordance with law.

### 6. Calculating FMV on the Basis of Split TRB Sets

For the purpose of comparing FMV to USP, Commerce calculated FMV by splitting TRB sets sold in the home market into their component parts: individual cups and cones.[6]

Koyo complains that Commerce erred. Koyo first represents that cups and cones split from sets are not commercially comparable to individually-sold cups and cones. Koyo contends that the value of a TRB set is greater than the value of its individual parts, i.e., the cup and cone components. Thus, Koyo maintains that the split set components are not "such or similar" to cups and cones sold individually in the U.S. market. See 19 U.S.C. § 1677(16). In support, Koyo cites Koyo Seiko Co. v. United States, 18 CIT 740, 861 F.Supp. 108 (1994). Lastly, Koyo claims that set splitting is a "fabrication of sales of cups and cones in the home market" in contravention of 19 U.S.C. § 1677b(a)(1).[7] Mem. Supp. Pls.' Mot. J. Agency R. at 42–43. Koyo further argues that splitting of sets was unnecessary as it had sufficient sales of cups and cones for matching in both markets. Koyo requests that Commerce be instructed not to split TRB sets sold in the home market or, at a minimum, not compare split home market sets but to rely on components sold separately in the home market. If permitted to split TRB sets, Koyo urges that Commerce be directed to make an adjustment for the difference in value between split set components and individually-sold components. Id. at 41–48.

Commerce responds that the splitting of TRB sets created a sufficiently large pool of potentially comparable cups and cones from which to determine FMV based on price instead of constructed value. Def.'s Opp. Pls.' Mot. J. Agency R. at 25.

■ Confronted with similar arguments, the Court has previously upheld Commerce's practice of splitting TRB sets to calculate FMV. See NTN Bearing Corp. of Am. v. United States, 18 CIT 1178, ——, 881 F.Supp. 584, 590 (1994) (Commerce's set-splitting methodology discourages circumvention of the antidumping law); NTN Bearing Corp. v. United States, 14 CIT 623, 640, 747 F.Supp. 726, 741 (1990) (TRB component parts "such or similar" to other component parts, retain status where sold as sets); Timken Co. v. United States, 11 CIT 786, 794–95, 673 F.Supp. 495, 504–05 (1987).

In addition, Koyo Seiko, 18 CIT at ——, 861 F.Supp. at 108, does not stand for the proposition that the commercial value of a TRB set is increased simply because the two individual components are sold together. That case addressed the issue of increased value from additional material or labor and a process of assembly after importation. Koyo Seiko, 18 CIT at ——, 861 F.Supp. at 114–15 (placement of individual TRB components placed in a box for sale as a set increases value and requires an adjustment for further manufacturing of merchandise under 19 U.S.C. § 1677a(e)(3) (1988)). However, the record indicates that this case does not support Koyo's position. See Confidential Mem. Supp. Pls.' Mot. J. Agency R. at 43 n. 6.

Furthermore, Commerce determined that the home market comparison merchandise was approximately of equal commercial value by comparing the variable cost of manufacturing of potential home market matches to that of the U.S. model, subject to a twenty percent limit on differences in the variable costs. To the extent that there are differences in commercial value between TRB sets

---

**6.** A TRB set contains two component parts: the "cup" or outer ring; and the "cone" which consists of an assembly of an inner ring, a cage containing the rolling elements, and the rolling elements.

**7.** 19 U.S.C. § 1677b(a)(1) provides: "In the ascertainment of foreign market value for the purposes of this title no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account."

and corresponding unassembled component parts, they are accounted for in Commerce's difference-in-merchandise ("difmer") adjustment by which the total cost of manufacturing the set is allocated to the component parts.

In addition, 19 U.S.C. § 1677b(a)(1) prohibits fictitious, sham or hypothetical transactions. In this case, Commerce was able to determine a foreign market value for TRB components sold as sets based upon Koyo's actual and legitimate sales in the home market. As pretended sales were not involved, Commerce could use the components in question as comparison models. *See Timken Co. v. United States*, 11 CIT at 794–95, 673 F.Supp. at 504–05.

Lastly, Commerce's selection of methodologies may be affected by general considerations in a given case, *i.e.*, discouraging control of the manner in which FMV is determined, increasing the "pool" of home market sales for possible comparison to U.S. sales. Commerce's legitimate policy choices deserve regard. *See Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660, 665 (Fed.Cir.1992). A respondent's invoicing methods cannot become the predominant factor in determining the selection of comparison models. Such a result would be inconsistent with the Court's concerns identified in *NTN Bearing Corp.*, 14 CIT at 623, 747 F.Supp. at 726, and *Timken*, 11 CIT at 786, 673 F.Supp. at 495.

Therefore, the Court sustains Commerce's calculation of FMV of TRB components by allocating the sales price of the TRB sets to their individual components. *See NTN Bearing Corp.*, 19 CIT at ——, 924 F.Supp. at 204; *NTN Bearing Corp. of Am. v. United States*, 19 CIT ——, 881 F.Supp. 595, 600 (1995).

### 7. *Ordinary Course of Trade*

Koyo questions Commerce's inclusion of certain small quantity sales in the home market database which Koyo claims were made outside the ordinary course of trade. *See* 19 U.S.C. § 1677b(a)(1); 19 U.S.C. § 1677(15); 19 C.F.R. § 353.46(a)(1). Many of the sales at issue were of sample products. Koyo

maintains that the prices for the samples were negotiated separately from its normal sales, the sales were identified as samples when the order was taken and its sample sales have been excluded by Commerce in previous TRB proceedings. The remainder of the sales in question consist of obsolete TRB models. Koyo maintains that these products were sold at high prices because they were obsolete and inventories were maintained only to accommodate particular customers. Koyo complains that the inclusion of these sales in calculating foreign market value increased its total potential unpaid dumping duties for these reviews. Koyo seeks their exclusion and recalculation of its dumping margins. Mem. Supp. Pls.' Mot. J. Agency R. at 48–53.

Commerce argues that Koyo's claim of sample and obsolete sales was insufficiently substantiated and it is not obliged to continue to accept Koyo's claims merely because it accepted similar unsubstantiated claims in the past. Def.'s Opp. Pls.' Mot. J. Agency R. at 36. To support its differing treatment in the instant reviews, Commerce cites *Murata Mfg. Co. v. United States*, 17 CIT 259, 263–64, 820 F.Supp. 603, 606 (1993) (the occurrence of home market sales made in low quantities and at higher prices than sales of other home market models, without further support, is insufficient to establish that the sales are outside the ordinary course of trade).

■ Koyo bears the burden of proving that the sales used in Commerce's calculations are outside the ordinary course of trade. *NTN Bearing Corp. of Am. v. United States*, 19 CIT ——, ——, 903 F.Supp. 62, 68–69 (1995); *Nachi–Fujikoshi Corp. v. United States*, 16 CIT 606, 608, 798 F.Supp. 716, 718 (1992).

Koyo represents that its proof that particular sales were outside the ordinary course of trade meets the *Murata* standard. Pls.' Reply Br. at 40.

The Court has held that Commerce cannot exclude sales allegedly outside the ordinary course of trade from FMV unless there is a complete explanation of the facts which establish the extraordinary circumstances ren-

dering particular sales outside the ordinary course of trade. *NTN Bearing Corp.,* 19 CIT at ——, 905 F.Supp. at 1091. In *NTN,* the Court found that mere identification of certain sales as sample, zero price and infrequent small quantity sales, without further explanation, as is the case here, was insufficient to establish that the sales were made outside the ordinary course of trade. *Id.* at ——, 905 F.Supp. at 1090–91. More specifically, in *NTN Bearing Corp.,* 19 CIT at ——, 903 F.Supp. at 68–69, the Court rejected arguments that the intent behind the transaction, corroborated by plaintiffs' certification of factual accuracy of its reporting, sufficiently established that its sample and small quantity sales were outside the ordinary course of trade. Similarly here, evidence that sales are marked as samples when the order is taken is insufficient to support Koyo's claim. The Court has also upheld Commerce's refusal to exclude infrequent small quantity sales or sales of models at a high price to only a few customers. *See NTN Bearing Corp.,* 20 CIT at ——, 924 F.Supp. at 207–08.

The Court has previously adopted the position espoused in *Murata Mfg. Co.,* 17 CIT at ——, 820 F.Supp. at 607, that the determination of whether home market sales are in the ordinary course of trade requires an evaluation of not just "one factor taken in isolation but rather ... all the circumstances particular to the sales in question." *See, e.g., NTN Bearing Corp.,* 19 CIT at ——, 905 F.Supp. at 1091; *NTN Bearing Corp.,* 903 F.Supp. at 68; *See also CEMEX, S.A. v. United States,* 19 CIT ——, ——, 1995 WL 251561 *1–2 Slip Op. 95–72 at 6 (Apr. 24, 1995). One of the factors which the court in *Murata* observed was found by Commerce to be probative in another administrative review is respondent's " 'sales practices with respect to sample sales at the verification ... and the [determination] that the prices of samples were negotiated separately from the standard price agreements.' " *Murata,* 17 CIT at 263, 820 F.Supp. at 606 (citing *Tapered Roller Bearings, Finished and Unfinished, and Parts Thereof, From Japan, Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 4,951, 4,958–59 (1992)). The instant record, however, does no more than announce that prices for Koyo's samples were negotiated separately from normal sales; it does not demonstrate it. *See* Confidential R. Doc. No. 9, Koyo 1990/91 Questionnaire Response, dated March 27, 1992, Section V at 8; Confidential R. Doc. 9 at 8–9, Koyo 1991/92 Questionnaire Response, dated March 30, 1993, Section V at 8–9. Therefore, in this case, this factor is unpersuasive.

In addition, Commerce's treatment of sales in another proceeding is irrelevant to this case. The Court has recognized that Commerce's determinations must be individually examined, taking into account all of the relevant facts of each case. *NTN Bearing Corp.,* 19 CIT at ——, 905 F.Supp. at 1091.

Accordingly, the Court upholds Commerce's inclusion of Koyo's small quantity sample sales and sales of obsolete TRB models in the home market data base used to determine foreign market value.

### Conclusion

This case is remanded to Commerce to allow it to recalculate adjustments for U.S. discounts and sales allowances using customer-specific data reported by Koyo. The Final Results are sustained as to all other issues raised by Koyo.

### ORDER

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade administration, to recalculate adjustments for United States discounts and selling expenses using the customer-specific data reported by plaintiffs; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date that this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within

fifteen (15) days of the date that responses or comments are due.