PISTACHIO GROUP OF THE ASSOCI-
ATION OF FOOD INDUSTRIES,
INC., et al., Plaintiffs,

v.

The UNITED STATES, Defendant,

and

California Pistachio Commission, et al.,
Defendant-Intervenors.

Court No. 86-08-01037.

United States Court of
International Trade.

Sept. 29, 1987.

Harris & Berg, Cheryl Ellsworth, Washington, D.C., for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Platte B. Moring, III, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

Fried, Frank, Harris, Shriver & Jacobson, David E. Birenbaum and Alan Kashdan, Washington, D.C., for defendant-intervenors.

## OPINION

RESTANI, Judge:

Before the court is plaintiffs' Rule 56.1 motion for judgment based upon the record before the International Trade Administration of the Department of Commerce (ITA), which resulted in the final affirmative antidumping duty determination concerning *Certain In-Shell Pistachio Nuts from Iran.* 51 Fed.Reg. 18919 (1986).

Plaintiffs assert two bases for their claim that the determination is not supported by substantial evidence of record and is not in accordance with law. First, plaintiffs assert that use of official Iranian exchange rates to convert fair market value figures from Iranian rials to United States (U.S.) dollars was contrary to the antidumping laws, because actual market rates of exchange were ignored. Second, plaintiffs assert that ITA acted unreasonably in rejecting information provided by the respondent in the investigation, Rafsanjan Pistachio Producers Cooperative (RPPC), and by using the information submitted by petitioners.

Defendant responds that an appropriately promulgated, longstanding regulation required use of the official exchange rates in this case. Defendant further responds that the "best information available" rule allowed it to reject respondent's information on fair market value because respondent's answer to the questionnaire provided by ITA was incomplete, and further that it is permitted to use information supplied by the petitioner.

Defendant-intervenors take the same position as defendant, but also assert that both the exchange rate certified by the Federal Reserve Bank of New York and utilized by ITA, and the information submitted in its petition, were correct.

## FACTS

Important to the analysis here are the following facts:

1. Throughout the period of the investigation the United States had no diplomatic relations with Iran. The questionnaires and the responses were transmitted through the government of Algeria.

2. The only respondent, RPPC, also the only known producer of pistachios in Iran, provided prices for its home market sales without clearly delineating which were for export and which were for domestic consumption. RPPC does not export. The pricing information was provided at the time slightly beyond the deadline established.

3. RPPC, though requested to do so, did not obtain sales information from exporters, but indicated to ITA who the likely exporters were.

4. During the preliminary investigation plaintiffs sought a declaration by ITA that the proceedings were extraordinarily complicated. Such a declaration would have triggered an extension of time to respond to the questionnaire. A shorter, four-week extension was granted on the basis that RPPC displayed some cooperation in the investigation. A similar request by the Government of Iran was denied because it was not a participant in the proceedings.

5. RPPC was advised in advance that the ITA would use the "best information available" if it did not receive complete responses.

6. The final dumping margin was set at 241.14 per cent *ad valorem;* the scope of the finding was clarified so that only raw pistachios were included.

7. Following an affirmative determination of threat of material injury by the International Trade Commission (ITC) an antidumping order was issued.

8. The official Iranian exchange rate is 90 rials to the dollar. Both the Central Bank of Iran and the International Monetary Fund use this rate. Plaintiffs admit this is the official rate and the Government of Iran claims it is the only legal rate in Iran.

9. During the relevant period some exchange transactions existed outside of Iran at the rate of 600–650 rials to the dollar. Evidence of published quotations from inside and outside Iran were presented to the ITA.

10. Most, if not all, of the margins found would be eliminated if an exchange rate of 600–650 rials to the dollar was used, as opposed to the 90 rial to the dollar official exchange rate.

11. The 90 rial rate has remained relatively constant despite tremendous inflation in Iran.

## USE OF EXCHANGE RATES CERTIFIED BY THE FEDERAL RESERVE

Pursuant to 19 C.F.R. § 353.56 [1] ITA, in order to administer the antidumping laws, must make currency conversions in accordance with 31 U.S.C. § 5151.[2] Because the Secretary of the Treasury did not publish a current value for the Iranian rial, and because there was no current buying rate specified by the Federal Reserve Bank of New York (N.Y. Fed), the N.Y. Fed was to specify an appropriate exchange rate, pursuant to statutory provisions, as incorporated by ITA's regulation.

The regulation seemingly is written in absolute terms; on its face it appears to permit no deviation from the section 5151 scheme. Although there are procedures for obtaining a hearing at the N.Y. Fed regarding the appropriateness of rates, there is no mechanism for direct judicial

review of the rate setting decision. In cases involving assessment of duties under the customs laws, the Supreme Court has held that rates set by the N.Y. Fed are not subject to judicial review. *Barr v. United States*, 324 U.S. 83, 65 S.Ct. 522, 89 L.Ed. 765 (1945); *Hadden v. Merritt*, 115 U.S. 25, 5 S.Ct. 1169, 29 L.Ed. 333 (1885); *Cramer v. Arthur*, 102 U.S. (12 Otto) 612, 26 L.Ed. 259 (1880). The record is clear that ITA made no independent decision regarding the currency exchange rates, and ITA asserts it could not do so under its regulation.

The process described above has presented the court with two overlapping issues: first, whether a delegation of authority from ITA to the N.Y. Fed has occurred, and, if so, whether that delegation is valid; and, second, whether the ITA's interpretation of its regulation is correct, and if so, whether the regulation is valid under such an interpretation. These issues are addressed in detail below.

## DELEGATION OF AUTHORITY

█ Initially, the parties disagree about whether section 353.56(a) constitutes a delegation of authority from ITA to the N.Y. Fed. Defendant-intervenor appears to contend that a valid subdelegation has oc-

---

**1.** 19 C.F.R. § 353.56(a) [1980 and revision of Title 19 as of April 1, 1986] reads, in pertinent part, as follows:

In determining the existence and amount of any difference between the United States price and the fair value or foreign market value for the purposes of this part or of the Act, any necessary conversion of a foreign currency into its equivalent in United States currency shall be made in accordance with the provisions of section 522 of the Tariff Act of 1930, as amended (31 U.S.C. § 372) [current version at 31 U.S.C. § 5151 (1982)].

**2.** 31 U.S.C. § 5151 (1982) provides in pertinent part:

(c) Except as provided in this section, conversion of currency of a foreign country into United States currency for assessment and collection of duties on merchandise imported into the United States shall be made at values published by the Secretary under subsection (b) of this section for the quarter in which the merchandise is exported.

(d) If the Secretary has not published a value for the quarter in which the merchandise is

exported, ... the conversion of the currency of the foreign country shall be made at a value—

(1) equal to the buying rate at noon on the day the merchandise is exported; or

(2) prescribed by regulation of the Secretary for the currency that is equal to the first buying rate certified for that currency by the Federal Reserve Bank of New York under subsection (e)....

(e) The Federal Reserve Bank of New York shall decide the buying rate ... The Secretary shall publish the rate at times and to the extent the Secretary considers necessary. In deciding the buying rates, the Bank may

(1) consider the last ascertainable transactions and quotations (direct or through exchange of other currencies); and

(2) if there is no buying rate, calculate the rate from—

(A) actual transactions and quotations in demand or time bills of exchange; or

(B) the last ascertainable transactions and quotations outside the United States in or for exchange payable in United States currency or foreign currency.

curred. Plaintiff contends that no delegation has taken place, but that if such delegation did exist, it would be invalid. Defendant argues that no delegation or subdelegation has occurred because ITA merely "rel[ied] upon the particular institution that Congress has designated to develop and issue exchange rates for duty assessment and collection purposes." Defendant's Supplemental Brief at 3. According to defendant, the exchange rates set by the N.Y. Fed are comparable to other types of information that ITA routinely uses during its investigations. Specifically, defendant notes that in critical circumstances determinations, ITA may rely upon dumping determinations made by other countries and import statistics provided by the Bureau of Census. *See* 19 U.S.C. § 1673b(e)(1) (1982). In countervailing duty investigations, ITA apparently also relies upon interest rate benchmark figures provided by appropriate agencies in foreign countries to determine whether loans that are inconsistent with commercial considerations have been made. *See* 19 U.S.C. § 1677(5)(B)(i) (1982).

The analogy drawn between exchange rates and these other forms of information fails. ITA states that it has no discretion to review exchange rates set by N.Y. Fed, but it has not made a similar claim with respect to the other information it uses. Furthermore, ITA is required by regulation to obtain rates from N.Y. Fed during the course of the antidumping proceeding, even when N.Y. Fed has not published such rates in the ordinary course of its business. In ITA's other examples, the information gathered is not prepared specifically at the request of ITA, nor is its preparation an integral part of ITA's procedure.

The defendant also contends that there has been no delegation because the calculation of LTFV margins is merely incident to the calculation of rates for the collection and assessment of duties under section 5151. In essence, defendant argues that by authorizing the N.Y. Fed to calculate

exchange rates for assessment and collection purposes, Congress implicitly delegated the authority to calculate rates for related procedures.

This interpretation of section 5151 obfuscates the distinction that our Court of Appeals has drawn between LTFV determinations and the collection and assessment process. In *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924 (Fed.Cir.1984), the court specifically rejected appellee's argument that the "assessment and collection" language contained in section 5151 encompasses ITA's fair value investigation. The court stated:

> Melamine incorrectly asserts that the ultimate purpose of a fair value investigation and calculation is the assessment and collection of antidumping duties. The purpose of a fair value investigation is to determine whether LTFV sales are occurring to the injury of domestic industry. Such investigations may or may not result in the assessment and collection of antidumping duties.
>
> The notion that assessment and collection includes calculation of fair value, so that the two phases must be merged as argued by Melamine, has been laid to rest by the Supreme Court in *United States v. George S. Bush & Co.*, 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1940), and in *Barr v. United States*, 324 U.S. 83, 65 S.Ct. 522, 89 L.Ed. 765 (1945).

*Melamine*, 732 F.2d at 929. In light of the *Melamine* decision and the significant role played by the N.Y. Fed in the process of calculating dumping margins, the court concludes that a delegation has occurred.

The parties do not question ITA's authority to delegate the calculation of exchange rates. Although such authority is not explicitly granted in any statutory provision, the courts have generally upheld similar delegations particularly where, as here, the agency is charged with the administration of a complex regulatory program.[3]  K. Davis, *Administrative Law Treatise,*

---

**3.** According to the notice published in the Federal Register, the regulation at issue was promulgated pursuant to 19 U.S.C. § 2504(b) (1982) and 5 U.S.C. § 301 (1982). 45 Fed.Reg. 8182, 8190 (1980). These provisions generally allow

the Secretary of Commerce to promulgate regulations necessary for the administration of departmental programs and international trade agreements.

§ 3.17 (2d ed. 1978) (discussing *EEOC v. Raymond Metal Products Co.*, 530 F.2d 590 (4th Cir.1976)); *see also Tabor v. Joint Board for the Enrollment of Actuaries*, 566 F.2d 705 (D.C.Cir.1977). The dispute in the instant case does not concern ITA's authority to delegate some authority, but rather, whether it may delegate to the N.Y. Fed *all* of its authority to select an appropriate exchange rate in the situation at hand.

██ Delegations of administrative authority are suspect when they are made to private parties, particularly to entities whose objectivity may be questioned on grounds of conflict of interest. *See Sierra Club v. Sigler*, 695 F.2d 957, 963 n. 3 (1983) (citing *Sierra Club v. Lynn*, 502 F.2d 43, 58–59 (5th Cir.1974), *cert. denied*, 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (1975)). The New York Fed is part of the national Federal Reserve System and subject to supervision by the Board of Governors of the Federal Reserve System,[4] but it is also a private corporation whose stock is owned by the member commercial banks within its district. *See Committee for Monetary Reform v. Board of Governors of the Federal Reserve System*, 766 F.2d 538, 540 (D.C. Cir.1985). Although member banks lack the direct control over decision-makers enjoyed by most corporate shareholders, it is not unreasonable to assume that, where possible, officials at N.Y. Fed would pursue policies that enhance the health of member banks. Extrapolating from this, it is not difficult to imagine a situation in which the interest of the bank's members might conflict with the bank's responsibility to formulate accurate exchange rates under section 5151.[5] For example, the adoption of a slightly distorted exchange rate pursuant to ITA's regulation could prevent an affirmative finding of LTFV sales that otherwise would be proper. This would enable foreign countries to sell more goods in the United States, thereby increasing their ability to repay loans made by member banks of the N.Y. Fed. Distorted exchange rates could also result in improper affirmative dumping findings. Such determinations could benefit member banks holding loans from domestic industries adversely affected by competition from imports.[6] Even though there have been no allegations of such behavior, the possibility that such conflicts could exist in certain situations cannot be ignored in the context of a legal regime which purports to exempt rate decisions of the N.Y. Fed from all forms of judicial and administrative scrutiny.

██ The parties have focused their attention in the delegation area on the more limited area of subdelegation. As defendants have noted, in recent years the courts have readily accepted subdelegations of authority within agencies. *See, e.g., Fleming v. Mohawk Wrecking and Lumber Co.*, 331 U.S. 111, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947) (upholding subdelegation of subpoena power). *See also* K. Davis, *Administrative Law Treatise* § 3.16 (2d ed. 1978). The case on which plaintiff relies, *Cudahy Packing Co. v. Holland*, 315 U.S. 357, 62 S.Ct. 651, 86 L.Ed. 895 (1942), has been distinguished repeatedly and no longer remains authoritative. *See Administrative Law Treatise* § 3.16, and cases cited therein. It is important to note, however, that the instant case stretches the concept of

---

**4.** The Board members are appointed by the President with the advice and consent of the Senate for fourteen year terms. *See* 12 U.S.C. § 241 (1982). Officers of the N.Y. Fed. are appointed through a combination of actions of the Federal Reserve Board and the member banks. 12 U.S.C. §§ 304–5 (1982).

**5.** The court does not find that any impermissible actions were taken here, merely that the potential for abuse exists under defendant's view. To the court's knowledge, there are no published procedures governing the calculation of exchange rates under 31 U.S.C. § 5151, which further increases the potential for abuse.

**6.** Some of the potential conflicts discussed above are already inherent in section 5151. Because the N.Y. Fed possesses unreviewable discretion to set exchange rates for assessment and collection purposes, it can already control the ultimate amount of duties paid where an affirmative LTFV finding has been made. The mere presence of this authority, however, cannot justify an extension of discretion into the process of calculating LTFV margins. As discussed earlier, our Court of Appeals has distinguished the fair value stage of a dumping investigation from the assessment and collection stage. The expansion of unreviewable discretion into the LTFV determination would blur the distinctions drawn by the Court of Appeals in *Melamine Chemicals.*

proper subdelegation well beyond the parameters of past precedent. In the cases cited by the parties, authority was subdelegated to inferior officers *within the same agency*.[7] Presumably there is accountability if the decision is made within the same agency. Furthermore, the decisions made pursuant to subdelegation were not absolutely immune from review, as defendants contend the exchange rate decisions are in this case. The courts have consistently required subdelegation of significant functions to be checked by some form of review, either within the agency itself, or ultimately by the courts.[8] Lower level procedural decisions generally require less oversight than decisions which affect the substantive rights of regulated parties, or which embody the agency's most potent use of its discretionary authority. In all cases cited by the parties, however, courts were willing to approve subdelegations only if they ultimately were subject to some form of scrutiny.[9] Although the calculation of exchange rates in a LTFV investigation is an intermediate step in ITA's

determination, it nevertheless can alter completely the outcome reached by the agency. Given the importance of the type of exchange rate determination at issue to the outcome of the investigation, the determination must be considered a significant function entrusted to the ITA by Congress. Such a decision cannot be abandoned to an independent agency with private sector components, and isolated from all types of review, administrative or judicial, merely for reasons of convenience.

Therefore, the court concludes that if utilization of exchange rates set by the N.Y. Fed solely at the request of ITA for purposes of making an LTFV determination is not subject to ITA decision-making, an invalid delegation of ITA's authority has occurred.

## THE VALIDITY OF THE REGULATION AND ITS INTERPRETATION

■ Our Court of Appeals has clearly articulated the standard for reviewing the

7. In *Tabor v. Joint Board for the Enrollment of Actuaries, supra,* plaintiff alleged that a delegation was made to a private agency. The court seems to conclude that no delegation occurred or that whatever was done was authorized by Congress. 566 F.2d at 708 n. 5. The discussion in the following part makes clear that total delegation here is not authorized by Congress. It is also clear that the decision relied on in *Tabor* was not one which was made at the alleged delegator's request, as in the case at hand. *See infra,* note 12. Furthermore, there is no indication that the alleged delegator in *Tabor* was absolutely bound by the decision made by the private agency.

8. Obvious parallels can be drawn between the demise of the nondelegation doctrine, since *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (holding invalid standardless delegation of legislative power to the President made in section 3 of The National Industrial Recovery Act), and the increasing frequency with which intra-agency subdelegations of authority have been approved. Both developments reflect a growing sense that agencies should be given broader authority to develop procedures and standards necessary for their proper functioning. In the delegation area, the broadening of statutory delegations of authority has been accompanied by an expansion of judicial and administrative controls on administrative behavior. *See* H. Leventhal, *Principled Fairness and Regulatory Urgen-*

*cy.* 25 Case W.Res. 66, 70 (1974). Comparable measures provide an appropriate check on transfered powers in the area of subdelegation.

9. The nature of the decision that has been delegated may determine the level of administrative or judicial oversight that is required in a given case. For example, in *E.E.O.C. v. Raymond Metal Products Co.,* 530 F.2d 590 (4th Cir.1976), the court considered the validity of two separate subdelegations to a district director: first, the delegation of intermediate administrative functions; and second, the delegation of the Commission's authority to sue. The court held that the district director's decision as to intermediate matters need not be reviewed by the entire Commission because adequate judicial safeguards existed. 530 F.2d at 594. The court also upheld the transfer of the Commission's authority to sue. Noting that civil actions were not commenced until formal approval had been received from the Commission, the court held that no subdelegation had taken place. 530 F.2d at 595. (One might argue that decisions to bring suit may be made by intra-agency subdelegees unless expressly or impliedly forbidden by Congress, because the substantive rights will be subject to judicial disposition.) *See also E.E.O.C. v. Exchange Security Bank,* 529 F.2d 1214 (5th Cir.1976) (no subdelegation where agency by regulation has retained power to decide whether or not to set aside officer's decision about revoking or modifying a subpoena). *See infra* discussion in following part.

validity of regulations promulgated by ITA under the dumping law. In *Melamine Chemicals* the court stated:

> When the issue is the validity of a regulation issued under a statute an agency is charged with administering, it is well established that the agency's construction of the statute is entitled to great weight. . . . Similarly, agency regulations are to be sustained unless unreasonable and plainly inconsistent with the statute, and are to be held valid unless weighty reasons require otherwise.

732 F.2d at 928. (Citations omitted.) *See also Consumer Products Safety Division, SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033 (Fed.Cir.1985). The Supreme Court has held that longstanding agency regulations, such as section 353.56(a), are entitled to greater deference from the reviewing court.[10] *Zenith Radio Corp. v. United States,* 437 U.S. 443, 457, 98 S.Ct. 2441, 2448–49, 57 L.Ed.2d 337 (1978).

The reasonableness of the regulation, at least as it applies in most cases, is not in serious dispute. Intervenor has argued persuasively that symmetry in the calculation of exchange rates is desirable in the investigative and assessment phases of an antidumping investigation. When exchange rates are consistent, importers subject to antidumping orders can be assured that the duties they are required to deposit will not vary from the final assessment solely because of selection of a different basis for establishing exchange rates. *See* 19 U.S.C. § 1673e(a)(3) and 1673g(a). Furthermore, the use of exchange rates set by the N.Y. Fed reduces the overall administrative burden on ITA, thereby increasing the probability that investigations will be completed within the prescribed statutory time limit.[11] Thus, the regulation appears reasonable, at least insofar as it promotes consistency and looks to an experienced agency to provide exchange rates, thereby expediting the administrative process. The remaining issue is whether the agency has interpreted the regulation in a permissible manner.

■ As with the statute it administers, an agency's interpretation of its regulations is entitled to substantial weight, particularly where the interpretation is longstanding and has established expectations among parties appearing before the agency. In the instant case, however, such deference is not justified. First, the agency's interpretation would create an improper delegation; and second, although the regulation has been in existence nearly forty years, the issue raised in this case stems from a recent interpretation of the regulation. This appears to be the first time a party has requested ITA to review exchange rates calculated by the N.Y. Fed.

ITA has argued that its interpretation of the regulation is required by the regulation's command that exchange rates in LTFV determinations *shall* be calculated in accordance with section 5151. ITA contends that the presence of this imperative

**10.** The regulation at issue has existed in its current form since 1980. *See* 45 Fed.Reg. 8190 (1980). A similar regulation first appeared in the Federal Register in 1943. *See* 8 Fed.Reg. 8327 (1943).

**11.** Intervenor also argues that harmonizing the exchange rates would facilitate the automatic assessment of dumping duties which may occur under section 611(a)(2) of the Trade and Tariff Act of 1984, Pub.L. No. 98–573, 98 Stat. 2948, 3031 (1984) (codified at 19 U.S.C. § 1675(a)(1) (Supp. II 1984)). Under current law, when a party fails to request an annual review of an antidumping order, duties are automatically assessed at rates equal to the cash deposit rate for estimated duties on entries made (usually) in the twelve preceding months. 19 C.F.R. § 353.-53a(d) (1987). Intervenor argues that, in order for this assessment process to be fully automat-ic, the exchange rates set by the N.Y. Fed must be used to calculate the estimated deposit in connection with the original investigation.

This argument is not persuasive. If no request is made for an annual review, exchange rates set by the N.Y. Fed will govern estimated deposits and the ultimate assessment of duties. What intervenor is actually objecting to is the right of a party to challenge exchange rates upon which estimated duties are based. This is the only way the automatic assessment process could be interrupted. If the Court concludes that LTFV determinations may be challenged on the basis of inaccurate exchange rates, parties presumably would be able to request an annual review to address the same issue. Intervenor's argument, therefore, merely begs the question that is already at issue in this case.

language eliminates its discretion to conduct any subsequent review.

The presence of words such as "shall" in a regulation or statute will generally limit an agency's discretion. Here, however, such a construction is inconsistent with the transfer of function that occurs under the regulation. ITA cannot compel the N.Y. Fed to make an exchange rate determination in an LTFV investigation, as it has no authority over the N.Y. Fed. Because ITA has no means to compel or expedite the determination, there is a possibility that the N.Y. Fed, perhaps because of overwork or a new-found lack of comity with the Commerce Department, could fail to act pursuant to ITA's request. The lack of control that characterizes this process must be offset by some residual discretion that allows ITA to set rates if the N.Y. Fed fails to act properly. Without such discretion, ITA cannot fulfill the goals of expediency and efficiency that the regulation was originally designed to achieve. Thus, the imperative language in the regulation cannot support an interpretation which completely divests ITA of the discretion it needs to fulfill its statutory purposes.

Furthermore, the policies of the antidumping law require that ITA's residual discretion include the ability to avoid error in cases where the N.Y. Fed has chosen an incorrect exchange rate. Our Court of Appeals has recognized that findings of LTFV sales are not appropriate when they result solely from the misapplication of exchange rates. In *Melamine Chemicals*, the court upheld ITA's use of a 90–day lag rule for selecting exchange rates and stated:

> Though the CIT noted that the United States had cited "no authority for using a 90 day lag rule", that authority stems from *Commerce' duty to enforce fairly the antidumping laws by determining whether LTFV sales are or are not occurring.* The purpose of the antidumping law, as its name implies, is to discourage the practice of selling in the United States at LTFV by the imposition of appropriately increased duties. That purpose would be ill-served by application of a mechanical formula to find LTFV sales, and thus a violation of the antidumping

laws, where none existed. A finding of LTFV sales based on a margin resulting solely from a factor beyond the control of the exporter would be unreal, unreasonable, and unfair.

732 F.2d at 933 (emphasis added). *See also Luciano Pisoni Fabrica Accessori Instrumenti Musicali v. United States*, 11 CIT ——, 640 F.Supp. 255, 260 (CIT 1986).

Defendants have argued that the language cited above is not relevant because the *Melamine* court was interpreting a separate regulation. The court's opinion apparently reserved judgment on the issue presented in this case. *See* 732 F.2d at 930. Nevertheless, it would be shortsighted to confine the Court of Appeals' guidance to the regulation at issue in *Melamine*. An improper exchange rate will distort an LTFV determination, regardless of whether it results from an error in calculation, or the selection of a valid rate from an improper period in time, or from the type of problems which may exist here. In any case, the agency must exercise its residual discretion to ensure that LTFV sales have actually been made.

ITA's interpretation of the regulation would also impermissibly restrict the court's scope of review in this matter. As discussed earlier, ITA review of the rates used in the LTFV determination is necessary to preserve the legality of the delegation of authority made to the N.Y. Fed. ITA's decisions in this area are subject to judicial review. *See* 19 U.S.C. § 1516a(b)(1)(B) (1982) and 28 U.S.C. § 1581(c) (1982). Furthermore, but for the promulgation of the regulation and the interpretation it has been given, it is clear that ITA would have been responsible for determining exchange rates. Because the court has no jurisdiction to review N.Y. Fed's exchange rate determinations directly, the regulation, as interpreted by ITA, effectively prevents the court from deciding whether exchange rates (and ultimately LTFV decisions) are supported by substantial evidence. The interpretation defendant has given the regulation would thus create a major exception to the general standard

of reviewability that governs ITA determinations.

Defendants have argued that a judicially imposed requirement of independent decision-making will prevent ITA from making timely determinations, and force it to make decisions in an area in which it has little expertise. These concerns carry little weight. As discussed earlier, ITA currently lacks control over the timing of the N.Y. Fed's decision; thus, no mechanism currently exists to ensure that exchange rate determinations are made in a timely manner. Furthermore, the facts of this case present an unusual situation that is not likely to recur on a regular basis. Here, ITA had to resort to rates calculated at its request by N.Y. Fed because no quarterly rates had been published by the Treasury Department and no buying rates existed. Rates which are used on a regular basis in actual transactions are more reliable and would be subject to fewer disputes.[12] The difficulty of identifying a rate in this case stemmed from an unusual combination of political, commercial, and diplomatic factors which necessitated ITA's request and resulted in the subsequent dispute over the propriety of the rate.

Finally, ITA's claims of naivete in this area are overstated. When it determines whether exchange rate policies constitute countervailable benefits, ITA may be required to look at the differences between official rates and free-market rates. In fact, in a companion case to this action, ITA determined that a countervailable benefit existed in part based on allegations that exporters could sell retained foreign exchange at market rates. *See* 51 Fed. Reg. 8344, 8345 (March 11, 1986). Plaintiffs allege that the market rate utilized in that determination was similar to the one asserted by plaintiffs here.[13]

By finding that the regulation at issue must be interpreted to provide for ITA decision-making and resulting judicial review, the court may have assuaged its concerns regarding delegation of authority. As noted earlier, the availability of administrative and judicial review may cause a court to conclude that no delegation has occurred. *See Exchange Security Bank,* 529 F.2d at 1218. If review is required of the exchange rates, ITA's reliance upon them could be viewed as a limited procedural process, perhaps undeserving of the label "delegation."

Cases such as *Exchange Security Bank* simply illustrate the necessity of requiring some check on transferred authority. By ruling that "no delegation has occurred" rather than finding that a given delegation is proper, courts may avoid answering difficult separation of powers and related questions or objections to the degree of power transferred.[14] Regardless of whether the easier or more difficult analytical course is followed, the court's conclusion ultimately must depend, in part, on the type of review provided. Accordingly, the court holds that the ITA erred in failing to consider, when requested to do so, what exchange rate should be utilized in order to carry out the antidumping laws.

## USE OF "BEST INFORMATION AVAILABLE"

The ITA's final determination in this matter relied on the "best information available," 19 U.S.C. § 1677e (1982 and

12. In any case, this court does not reach the issue of whether ITA must retain decision-making authority when it is using ordinary published rates. ITA does not initiate the setting of such rates; therefore, there is less reason to view reliance upon such rates as delegation of authority, with all of the attendant problems of that concept.

13. It is true that the market rate ITA used was the "best information available" and was obtained from the petition. The decision indicates, however, that ITA would have made a

further investigation if respondent had provided adequate information.

14. The parties raised no Constitutional challenges to the regulation as interpreted by defendant. Perhaps any constitutional questions involving delegation of functions to independent agencies are easily resolved because of the limited nature of the functions involved. There is no need to explore these questions so long as the regulation is interpreted to require ITA to exercise its own decision-making powers in this case.

Supp. III 1985),[15] in order to calculate foreign market value. The information used was that supplied by petitioner. Plaintiffs' claim that the information supplied by RPPC was inherently more reliable because of RPPC's presence in Iran, and that ITA erred in using the petitioner's information under the "best information available" provision.[16]

RPPC indicated that because it was not an exporter of pistachios it could not provide the information requested concerning which of RPPC's sales were home market sales and which were sales of pistachios destined for export. Such information is necessary so that ITA may make the comparisons required by the antidumping laws. 19 U.S.C. § 1673, *et seq.* Although the lack of diplomatic relations between Iran and the United States probably exacerbated the "inability" to provide the proper information in a timely manner, this does not relieve RPPC of its duty to provide the information. To the contrary, the absence of diplomatic relations made it highly reasonable for ITA to rely on the one party with whom it made contact to provide the necessary information, either on its own or by contacting exporters known to it, so that actual values could be ascertained. The ITA was never able to obtain pricing information from exporters or pricing information from RPPC for pistachios sold for export, as compared to those sold for domestic consumption. It never verified the partial information provided.

The best information rule prevents a respondent from controlling the results of the investigation by providing partial information or by delaying or otherwise hindering the investigation. *See Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1560 (Fed.Cir.1984). Given ITA's lack of subpoena power, the rule of section 1677e(b) may be the most effective means of compelling a recalcitrant party to provide necessary information.

■ The record reflects a reluctance to comply with the investigation on the part of RPPC. ITA's grant of an extension of time to RPPC to comply, and the warning to RPPC of the possible use of the "best information available," demonstrates a reasonable approach in view of the lack of full cooperation. Given the lack of complete information from RPPC, ITA was justified in not proceeding to verify the information RPPC provided and in relying on the information supplied by petitioner, the "best information otherwise available." 19 U.S.C. § 1677e(b).

In accordance with the reasoning above, this matter is hereby remanded to ITA. ITA shall determine whether utilization of the exchange rates set by the N.Y. Fed improperly creates artificial dumping margins in this case.

---

**15.** 19 U.S.C. § 1677e provides in part

(a) **General Rule.**—... If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its action, which may include in actions referred to in paragraph (1) [a final determination] the information submitted in support of the petition.

(b) **Determination to be made on best information available.**—In making their determinations under this subtitle, the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

**16.** Although the court will address this issue, it does not appear to be a serious question in this case. This point is raised almost as an afterthought in plaintiffs' main brief. In their response defendant-intervenors pointed out that, if adjusted for relevant levels of trade, plaintiffs' and defendant-intervenors' figures for foreign market value are essentially equivalent. Plaintiffs did not respond to this in their reply.