INDUSTRIA DE FUNDICAO TUPY and American Iron & Alloys Corp., Plaintiffs,

v.

The UNITED STATES, Defendant,

and

Grinnell Corporation, Ward Manufacturing, Inc., and Stockham Valves & Fittings Co., Inc., Defendant–Intervenors.

Slip Op. 96–113.
Court No. 95–09–01160.

United States Court of International Trade.

July 22, 1996.

Sonnenberg & Anderson, Philip Yale Simons and Jacqueline Paez, New York City, for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director; Rhonda K. Schnare, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; Michelle K. Behaylo, of counsel, Office of Chief Counsel for Import Administration, Washington, DC, for defendant.

McKenna & Cuneo, L.L.P., Lawrence J. Bogard and Peter Buck Feller, Washington, DC, for defendant-intervenors.

## MEMORANDUM AND ORDER

### I

### INTRODUCTION

WALLACH, Judge:

This case tests whether a foreign exporter to the United States may force the government to use low antidumping rates determined in an initial less-than-fair-value ("LTFV") investigation by refusing to provide updated information for an administrative review. Plaintiffs, Industria de Fundicao Tupy ("Tupy"), the sole exporter of malleable cast iron pipe fittings from Brazil, and American Iron & Alloys Corporation ("American Iron"),[1] challenge the final results of the International Trade Administration, Department of Commerce ("ITA" or

"Commerce"), of the first administrative review of a 1986 antidumping duty order. *Final Results of Administrative Review; Malleable Cast Iron Pipe Fittings from Brazil,* 60 Fed.Reg. 41,876 (August 14, 1995) (*"Final Results"*). Because Tupy refused to cooperate in the administrative review, Commerce used the simple average of the rates from the initial 1985 petition as best information available ("BIA") for the first administrative review period, even though in 1986 the ITA had calculated a lower margin in the less-than-fair-value ("LTFV") investigation. The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(A)(i)(I) (1988) and 28 U.S.C. § 1581(c) (1988).

For the reasons discussed below, the Court holds that Commerce's choice of BIA is proper. This is an unusual situation where the only respondent to an administrative review was the sole participant in the initial antidumping duty determination. The Court will not allow respondent to cap its antidumping duty rate by refusing to provide updated information to the ITA. Moreover, because all related information was uniquely within the sole possession of Tupy, Commerce was justified in its decision to use data from the initial antidumping petition as the basis for its updated margin calculation.

### II

### BACKGROUND

In 1985, the Cast Iron Pipe Fittings Committee, on behalf of the domestic producers of pipe fittings, filed a petition seeking an antidumping investigation of malleable cast iron pipe fittings from Brazil. *See Malleable Iron Pipe Fittings from Brazil; Initiation of Antidumping Duty Investigation,* 50 Fed. Reg. 34,730 (August 27, 1985) (*"Initiation 1985"*). The investigation was conducted only with respect to Fundicao Tupy, S.A., the sole exporter of malleable cast iron pipe fittings from Brazil.[2]

---

1. American Iron is the related party importer. Brief in Support of Plaintiffs' Motion For Judgment Upon The Agency Record at 3 ("Tupy's Brief").

2. The petition alleged dumping margins of 42.58 percent and 46.03 percent *ad valorem* (later ad-

justed to 53.6 percent to 61.7 percent due to exchange rate errors), based on a "price-to-price" comparison, and dumping margins of 8.8 and 14.46 percent *ad valorem*, based on the "constructed value" of the same products. *See Initiation 1985,* 50 Fed.Reg. at 34,730.

Commerce concluded that Tupy was dumping pipe fittings during the period of investigation ("POI"), February 1, 1985 through July 31, 1985, at a margin of 5.64 percent. *Malleable Cast Iron Pipe Fittings, Other than Grooved, from Brazil; Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 10,897 (March 31, 1986) ("*Final Determination*"). After the U.S. International Trade Commission ("ITC") determined that the malleable cast iron pipe fittings from Brazil were a cause of material injury to the competing domestic industry, *Certain Cast Iron Pipe Fittings from Brazil, Korea, and Taiwan,* 51 Fed.Reg. 18,670 (May 21, 1986), Commerce published an Antidumping Order (the "Order") against *Malleable Cast Iron Pipe Fittings from Brazil,* 51 Fed.Reg. 18,-640 (May 21, 1986), which required importers of Brazilian pipe fittings to deposit estimated duties at an *ad valorem* rate of 5.64 percent.

On July 15, 1994, Commerce initiated the first administrative review of this Order, *Initiation of Antidumping Administrative Review and Requests for Revocation in Part,* 59 Fed.Reg. 36,160, based on the request by three domestic manufacturers, Grinnell Corporation, Ward Manufacturing, Incorporated, and Stockham Valves and Fittings Company, Incorporated ("Petitioners"). Public Document to the Administrative Record ("Pub.Ad. Rec.") at Fiche 2, Frame ("Fr.") 1. Commerce sent its standard administrative review questionnaire to Tupy, requesting data on its sales and its selling prices in the United States and Brazil for the May 1, 1993 through April 30, 1994 period of review ("POR"). Pub.Ad.Rec. at Fiche 3, Frs. 7, 9.

Tupy failed to respond to the questionnaire, and instead, requested either revocation of the Order or postponement of the review. Pub.Ad.Rec. at Fiche 5, Fr. 1. On September 9, 1994, the Court granted an ex-parte Temporary Restraining Order, sought by Tupy, enjoining Commerce from conducting the administrative review. Defendant–Intervenors' Brief in Opposition to Plaintiffs' Motion for Judgment on the Agency Record at appendix B. The Temporary Restraining Order was dissolved on October 6, 1994, fol-

lowing the denial of Tupy's motion for a Preliminary Injunction barring Commerce from conducting the administrative review. *Industria de Fundicao Tupy v. Brown,* 866 F.Supp. 565 (CIT 1994).

In a letter to Commerce dated October 31, 1994, Tupy expressly refused to provide the information requested in the questionnaire, stating that " . . . the disruption of [our] on-going business, the fact that [our] records are not computerized in the format required by the [ITA], and the potential benefits derived from [our] insignificant exports to the United States do not justify the time and expense related to compiling the information and completing the questionnaire." Pub.Ad. Rec. at Fiche 5, Fr. 26.

When Tupy refused to provide information to Commerce, Petitioners urged Commerce to base the administrative review on BIA, and to use "the simple average of the dumping margins alleged in the Petition that resulted in the Order under review, specifically, 34.65 percent." Pub.Ad.Rec. at Fiche 5, Fr. 33. Tupy agreed that Commerce must use BIA, but argued that Tupy's existing dumping margin was the best information available.[3]

Commerce preliminarily based BIA on Tupy's estimated duty deposit rate. It noted that "[b]ecause Tupy refused to respond to our requests for information . . . we have used the highest rate ever found in this proceeding to establish its margin. This rate is 5.64%." *Certain Malleable Cast Iron Pipe Fittings From Brazil; Preliminary Results of Antidumping Administrative Review,* 60 Fed.Reg. 9,821 (Feb. 22, 1995) ("*Preliminary Results*").

In an administrative case brief submitted to Commerce on March 24, 1995, the domestic manufacturers reiterated that BIA should be based on the simple average of the dumping margins alleged in the petition, and also suggested that if Tupy's 1985 dumping margin were used as the basis for BIA, it should be adjusted upward to reflect changes in exchange rates, resulting in a dumping margin of 38.84 percent. Pub.Ad.Rec. at Fiche

3. That was the 5.64 percent rate for the estimated dumping duties that Tupy had deposited on

the importations subject to the review. *See Preliminary Results,* 60 Fed.Reg. at 9,821.

7, Fr. 16. In response, Tupy restated its earlier argument that BIA should be based on Tupy's dumping margin from the 1985 POI.

On August 14, 1995, Commerce published the *Final Results,* in which it stated:

> [u]pon review of the comments our choice of a rate to use as first-tier BIA [a rate of 5.64 percent] has changed. In this case, Tupy is the only company to have ever been reviewed or investigated, and we have only calculated one margin, which was in the less-than-fair-value (LTFV) investigation. Due to the unusual situation, we have determined to use as BIA the simple average of the rates from the petition.

60 Fed.Reg. at 41,877.

Commerce reasoned that Tupy's refusal to respond to the questionnaire, "leaves unanswered a legitimate question as to whether the firm dumped subject merchandise . . . to a greater or lesser extent than in the past." *Final Results,* 60 Fed.Reg. at 41,878. It expressed concern that Tupy might be relying on Commerce's normal BIA practice which would cap Tupy's dumping rate at the 5.64 percent LTFV rate, that the capped rate would allow Tupy to practice injurious price discrimination without adverse consequences, and that it would have no incentive to cooperate in any future review. *Id.*

Thus, Commerce decided to use the simple average of rates from the initial petition as BIA in the administrative review. *Id.* at 41,878. It concluded that importations of Tupy's pipe fittings during the period of May 1, 1993 through April 30, 1994, should be assessed antidumping duties at a rate of 34.64 percent.[4] *Id.*

Tupy and American Iron filed this action on September 12, 1995, contesting Commerce's use of the simple average of rates found in the petition as BIA, and seeking remand to the ITA to amend the final determination in the antidumping administrative review, and use the published 5.64 percent rate as BIA in accordance with the ITA's standard methodology. In the alternative,

they ask to remand this matter to the ITA for further analysis and consideration, including 1) providing detailed reasons for departing from standard practice of using published rates as BIA in antidumping duty administrative reviews; 2) considering and using the information obtained by the ITA in the original investigation in its determination of what constitutes BIA in this administrative review, or to provide detailed reasons for failing to consider and use this information; and 3) providing detailed reasons in support of its determination if it chooses upon remand to select unverified estimates of margins over verified margins in its determination of what constitutes the best information otherwise available in this administrative review.

Tupy and American Iron also moved to dismiss Count II of their Complaint because the pipe fittings exported by Tupy have not been imported into the United States during the period of May 1, 1993 through April 30, 1994. That Motion is unopposed.

## III

## DISCUSSION

### A

**The Standard Of Review For ITA Determinations Requires Affirmation Unless A Determination Is Unsupported By Substantial Record Evidence Or Otherwise Not In Accordance With Law**

The Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

### B

**The Parties Agree That Commerce Correctly Resorted To Best Information Available**

U.S. antidumping laws provide that the ITA may resort to BIA when a party fails or

---

4. The Court recognizes that the Petitioners calculated a simple margin of 34.65 percent while Commerce's calculation resulted in a figure of 34.64 percent. The Court presumes that the slight discrepancy is due to differing calculating procedures.

is unable to respond to a request for information. The BIA rule states:

> In making their determinations under this subtitle, the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

19 U.S.C. § 1677e(c) (1988).[5]

The ITA's standard methodology for determining BIA in administrative reviews of antidumping duty orders is:

> Generally, whenever a company refuses to cooperate with the [ITA] or otherwise significantly impedes the proceeding, the [ITA] uses as BIA the highest rate for any company for the same class or kind of merchandise from the current or any prior segment of the proceeding. When a company substantially cooperates with our requests for information, but fails to provide all the information requested in a timely manner or in the form requested, we use as BIA the higher of (1) the highest rate (including the "all others" rate) ever applicable to the firm for the same class or kind of merchandise from the same country from either the less-than-fair-value (LTFV) investigation or a prior administrative review; or (2) the highest calculated rate in the review for any firm for the same class or kind of merchandise from the same country.

*Preliminary Results,* 60 Fed.Reg. at 9,821. *See, e.g., Allied–Signal Aerospace Co. v. United States, et al.,* 996 F.2d 1185, 1188 (Fed.Cir.1993) (Approving ITA's policy).

Plaintiffs concede that use of BIA in this case was appropriate. Plaintiffs' Reply To Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record and Defendant–Intervenors' Brief in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record at 5 ("Tupy's Reply"). However, Plaintiffs claim that the ITA erred in its use of the simple average of the rates from the petition as BIA

for three reasons: (1) it did not follow its standard practice and use a published margin as BIA; (2) it allegedly failed to consider verified, company-specific information; and (3) it applied a punitive BIA margin contrary to the purpose of the antidumping statute. Tupy's Brief at 22. For the reasons which follow, Plaintiffs' arguments fail.

## C

### Commerce's Use Of The Simple Average Of The Rates From The Petition Is Supported By Substantial Evidence And Is In Accordance With Law

Instead of its standard methodology for determining the BIA in administrative reviews of antidumping duty orders, the ITA selected the average of the dumping margins estimated in the 1985 petition. Plaintiffs argue that Commerce's use of the simple average of the rates from the petition is unsupported by substantial evidence, and is not in accordance with law. Tupy's Brief at 6.

#### 1

### Congress Has Left The Determination Of BIA To The Discretion Of Commerce

The term "best information available" is not defined in either the statute or the legislative history, 19 U.S.C. § 1677e; H.R.Rep. No. 317, 96th Cong., 1st Sess. 77 (1979); S.Rep. No. 249, 96th Cong., 1st Sess. 98 (1979), and Commerce is responsible for establishing reasonable guidelines for the use of BIA. *See* H.R.Rep. No. 317 at 77; S.Rep. No. 249 at 98.

■ It is well-established that when a statute provides general guidance to an agency, the agency has great discretion in determining the exact methodology to be applied. *United States v. Zenith Radio Corp.,* 64 C.C.P.A. 130, 142–144, 562 F.2d 1209, 1229–1222 (1977), *aff'd* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978); *China Nat'l Metals & Minerals Import & Export v. United States,* 11 CIT 859, 865, 674 F.Supp. 1482, 1487 (1987). The courts will defer to an agency's determination of the methodology and procedures and not question the agency's methodology or sufficiency of the agency's investiga-

---

5. This case arose under the antidumping laws as    they existed on December 31, 1994.

tion so long as they "are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions ...". *Budd Co., Wheel & Brake Div. v. United States,* 15 CIT 446, 450, 773 F.Supp. 1549, 1553 (1991) (*quoting Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404–405, 636 F.Supp. 961, 966 (1986), *aff'd* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987)).

■■■ "The best information 'is not necessarily accurate information, it is information which becomes usable because a respondent has failed to provide accurate information.' " *Krupp Stahl A.G. v. United States,* 17 CIT 450, 453, 822 F.Supp. 789, 792 (1993) (*quoting Asociacion Colombiana de Exportadores de Flores v. United States,* 13 CIT 13, 28, 704 F.Supp. 1114, 1126 (1989), *aff'd* 8 Fed.Cir. (T) 97, 901 F.2d 1089, *cert. denied sub nom. Floramerica, S.A. v. United States,* 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990)). Therefore, this Court will grant great deference to Commerce's determination of BIA, if there is substantial evidence in the record supporting Commerce's choice, and that choice carries out the statutory purpose of BIA.

Because Tupy was the only company investigated in 1985, the normal BIA approach would *reward its refusal to cooperate and trap Commerce in a snare unintended by Congress.* When a respondent refuses to respond to a questionnaire, Commerce often uses as BIA the highest rate for any company for the same class or kind of merchandise from any review of the order or the LTFV investigation. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, et al.; Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 28,360, 28,379 (June 24, 1992); *see also Allied–Signal,* 996 F.2d at 1188.

Here, however, because Tupy was the only company investigated in the LTFV investigation of malleable cast iron pipe fittings from Brazil, 51 Fed.Reg. 1,544 (January 14, 1986), and because the review at issue is the first administrative review of this Order, Tupy's own LTFV rate of 5.64 percent was the only rate for any company from any post-petition segment of the proceeding. Accordingly,

Tupy asserted Commerce was bound by that rate for as long as it chose to refuse its cooperation. Instead of accepting Tupy's *fait accompli,* Commerce departed from its regular practice in selecting BIA. *Final Results,* 60 Fed.Reg. at 41,878.

■■ Commerce is not bound by its prior practice and may depart from its practice so long as it provides a reasonable explanation for the change. *Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1209–1210, 704 F.Supp. 1075, 1088 (CIT 1988). In explaining its departure here, Commerce stated:

By refusing to provide a questionnaire response ... Tupy leaves unanswered a legitimate question as to whether the firm dumped subject merchandise during the period of review to a greater or lesser extent than in the past. In not responding to our requests for information, Tupy could be relying upon our normal BIA practice to lock in a rate that is capped at its LTFV rate. Such a capped BIA rate would allow Tupy to practice injurious price discrimination to a greater degree than at the time of the LTFV investigation without fear of adverse consequences. With such a capped rate, Tupy would no longer have an incentive to participate in an administrative review which would determine the extent to which Tupy is actually dumping subject merchandise in the United States.

*Final Results,* 60 Fed.Reg. at 41,878.

Commerce determined that the simple average of the rates from the petition provided the best information available. The petition contained margins that Commerce had previously found to be acceptable for purposes of initiating the investigation, and was placed on the record of this review. *Final Results,* 60 Fed.Reg. at 41,878. Indeed, the statute requires a petition to "allege the elements necessary for the imposition of the [antidumping] duty, and which is accompanied by information reasonably available to the petitioner supporting those allegations." 19 U.S.C. 1673a(b)(1) (1988).

**2**

**The Antidumping Petition Contained Substantial Evidence That Tupy Was Dumping**

An antidumping petition filed with Commerce must (1) allege the elements necessary

for the imposition of antidumping duties, and (2) contain "information reasonably available to the petitioner" to support such allegations. *See* 19 U.S.C. § 1673a(b). Commerce will initiate an antidumping investigation when it determines that the petition does allege the elements necessary for the imposition of antidumping duties and support for such allegations exists based on information reasonably available to petitioners. *See* 19 U.S.C. § 1673a(c). Because the information contained in the Petition for the Imposition of Antidumping Duties against Malleable Iron Pipe Fittings from Brazil ("Petition"), dated July 30, 1985, Defendant–Intervenors' Supplemental Brief In Response to the Court's Order at appendix, satisfied the statutory requirements, Commerce initiated the antidumping investigation, *see Initiation 1985*, 50 Fed.Reg. 34,730, which ultimately led to the administrative review contested here.

The Petition contained extensive evidence to support the allegation that Tupy was dumping pipe fittings from Brazil in the United States market. For example, the section entitled "Information Regarding Sales At Less Than Fair Value" explained the calculation methodologies and the factual information supporting the calculation of Tupy's dumping margin proposed in the Petition. This section included the calculation of Foreign Market Value of Tupy's pipe fittings using two different methods provided for in 19 U.S.C. § 1677b (1985); the calculation of United States Price for Tupy's pipe fittings; and the comparison of United States Price and Foreign Market Value to calculate dumping margins for Tupy's products sold in the United States.

The Notice of Initiation described Petitioners' evidence as follows:

United States price was developed from sales offers by the Brazilian manufacturer's exclusive U.S. distributor. The price was determined by reference to a U.S. price list less discounts. Petitioner also made deductions for distributor markup, ocean freight and insurance, and U.S. inland freight. Petitioner selected prices for ½ inch black and ½ inch galvanized ell for margin calculations.

Foreign market value was derived by two methods. First, petitioner presented an April 3, 1983 price list for a Brazilian manufacturer which has been represented as a home market price list. The actual price is alleged to be discounted from the list price. The prices were adjusted by the ratio of ORTN indices (Obrigacoes Readjustaveis do Tesouro Nacional or National Treasury Readjustable Bonds) for April 1983 and November 1984. The prices were further reduced to reflect the internal value added tax. Although the petition states that the November exchange rate was used, the October 1, 1984 rate was actually used. We have adjusted petitioner's alleged dumping margins by using the November 15, 1984 exchange rate. The second method of establishing foreign market value was using a U.S. producer's cost of production with adjustments for cost differences in certain production inputs in Brazil. Petitioner added the statutory minimums of ten percent of the production cost for general expenses and eight percent for profit. Packing costs were also added and were based on actual expenses of a U.S. producer. Using these figures as modified above, petitioner found apparent dumping margins to 8.8 percent of 14.46 percent when foreign market value was based on adjusted production costs and dumping margins of 53.6 percent to 61.7 percent when home market prices were used for foreign market value.

*Initiation 1985*, 50 Fed.Reg. at 34,730.

Plaintiffs argue that while "[t]he Petition ... does contain information which may be considered relevant to support a conclusion regarding BIA in this administrative review", Plaintiffs' Supplemental Brief In Response To The Court's Order Dated June 20, 1996 at 7 ("Tupy's Supp. Brief"), the information contained in the petition is not as reliable as the verified, company-specific information supplied by Plaintiffs in the context of the original SLTFV investigation. Tupy's Supp. Brief at 8. Plaintiffs point to the requirement that the ITA always "obtain and *consider* the most recent information in its determination of what is best information." *Rhone Poulenc v. United States*, 8 Fed.Cir. (T) 61, 66, 899 F.2d 1185, 1190 (1990) (em-

phasis in original). Commerce can determine the relevancy of information contained in a petition only after obtaining and considering the most recent information available to it, according to Plaintiffs. Tupy's Supp. Brief at 10.

■ The Court disagrees with Plaintiffs' contentions and finds that Commerce did adequately explain its choice of BIA in this case and that the record contains substantial evidence supporting that choice. Commerce acted reasonably, in view of the adverse inference discussed below, in selecting as BIA information that was not the most recent because the information submitted by Tupy in the LTFV investigation is equally suspect.

### 3

### Commerce Correctly Applied An Adverse Inference When Determining BIA In This Case

Commerce may apply an adverse inference when determining what information constitutes BIA in an administrative review. *Rhone Poulenc,* 8 Fed.Cir. (T) at 67, 899 F.2d at 1190. The application of an adverse inference is rebuttable. *Id.* As stated by the Court of Appeals for the Federal Circuit:

> The [ITA's] presumption implements the basic purpose of the statute—determining current margins as accurately as possible. In addition, although Congress may not have intended it, the presumption effectively induces importers to comply with agency questionnaires.... However, since the presumption is rebuttable, it achieves this latter goal without sacrificing the basic purpose of the statute: determining current margins as accurately as possible.

*Id.* at 67–68, 899 F.2d at 1191.

Commerce has provided a reasonable explanation for its change in practice in this case. It drew the adverse inference that if Tupy was not responding to its questionnaire, it must be because the information requested would result in a determination less favorable to Tupy than the 1986 Order. In a market economy, we may presume parties act in their own self-interest. Thus, there is a rebuttable presumption that when a respondent refuses to provide Commerce with information, and instead counts on Commerce's reliance on old information, any new information would be presumptively more adverse to the reporting party than that already in Commerce's hands. *Cf, Rhone Poulenc, supra.*

The ITA's choice of BIA is thus reasonable because, even though the information in the petition was concededly inaccurate at that time, it is more accurate than the actual verified margin from 1985 which is now presumptively incorrect.

Plaintiffs argue that upholding Commerce's reasoning for its choice of BIA, (*i.e.,* that Tupy did not respond to the questionnaire and that the adverse presumption can only be rebutted by Tupy's full compliance with the ITA by answering the questionnaire), effectively makes the presumption irrebuttable. Tupy's Reply at 6. Without speculating on ways Tupy may have rebutted the adverse presumption without timely and complete responses, it is sufficient here to note that BIA is neither the sword nor the shield asserted by Tupy. The Court simply does not believe that Congress intended the statute to be used by a respondent in that manner.

■ Indeed, the statutory purpose of BIA is fulfilled by Commerce's choice of BIA. The BIA rule allows Commerce to complete an investigation even when a party is uncooperative and refuses to provide Commerce with the information requested. *See* 19 U.S.C. § 1677e(c) (1988). It is designed to induce respondents to timely provide Commerce with complete and accurate information to determine dumping margins as accurately as possible, *Rhone Poulenc,* 8 Fed.Cir. (T) at 67–68, 899 F.2d at 1191, and has been described as "an investigative tool, which [Commerce] may wield as an informal club over recalcitrant parties", as an incentive to noncomplying respondents to comply with requests for information from Commerce. *Atlantic Sugar v. United States,* 2 Fed.Cir. (T) 130, 134, 744 F.2d 1556, 1560 (1984); *see also Ansaldo Componenti, S.p.A. v. United States,* 10 CIT 28, 37–38, 628 F.Supp. 198, 205–206 (1986). Respondents are prevented

"from controlling the results of the investigation by providing partial information or by delaying or otherwise hindering the investigation" because Commerce may resort to BIA. *Pistachio Group of Association of Food Industries v. United States,* 11 CIT 668, 679, 671 F.Supp. 31, 40 (1987).

The Court also rejects Plaintiffs' argument that use of information contained in the petition as BIA will encourage petitioners "to allege the highest possible dumping margins in their petitions with the goal that these petition margins would be used as BIA margins in a subsequent administrative review." Tupy's Reply at 9. In most cases, the ITA can resort to its standard methodology in determining BIA. This is an highly unusual case [6] in which Commerce does not have its normal sources for BIA.

### 4

### In Making Its Determination To Base BIA On The Simple Average Of The Margins Contained In The Petition, Commerce Did Consider Other Available Information

In making antidumping determinations, the ITA is required to "obtain and consider the most recent information in its determination of what is best information." *Rhone Poulenc,* 8 Fed.Cir. (T) at 66, 899 F.2d at 1190. Plaintiffs argue that Commerce "failed to consider any other information available to it from these administrative proceedings," Tupy's Brief at 13, and thus because the ITA allegedly acted arbitrarily in its choice of BIA, this case should be remanded. Plaintiffs specifically claim that Commerce failed to consider the information provided by Tupy in the original investigation, from 1985. Tupy's Brief at 14–15.

Commerce, however, did consider other information available to it before it chose the simple average of the margins contained in the petition as BIA, including the information provided by Tupy in the original investigation. It therefore cannot be charged with acting arbitrarily. Indeed, the record reflects that Commerce actually used the infor-

mation provided by Tupy, resulting in the 5.64 percent dumping margin, in its *Preliminary Results.* 60 Fed.Reg. 9,821.

In its *Final Results,* Commerce reconsidered its Preliminary Results and revised its choice of BIA. The Court rejects Plaintiffs' argument that use of Tupy's information in the Preliminary Results does not constitute "consideration" of that information because Commerce allegedly chose that information based on a rigid rule without further reasoning or examination. Tupy's Reply at 12–15, *see Allied–Signal Aerospace Co.,* 996 F.2d at 1188. In order to determine that its preliminary choice of BIA was inappropriate, Commerce had to have compared the choices for BIA. Upon consideration of which choice was most appropriate, it chose the simple average of the margins in the petition as BIA.

### 5

### Commerce's Choice Of BIA Is Not Punitive

Plaintiffs argue that Commerce acted punitively in its choice of BIA because it "select[ed] unverified estimates of margins rather than the verified published rate." Tupy's Brief at 15. "By using the unverified estimates in the petition as BIA, the ITA arbitrarily choose [sic] high margin information and rejected low margin information, which it knew to be more accurate and probative based upon its earlier verification that found the margins alleged in the petition to be grossly erroneous." Tupy's Brief at 16. Plaintiffs conclude that Commerce wanted to punish Tupy and use Tupy as an example to other respondents. *Id.*

■ The application of the BIA rule is punitive if Commerce rejects "low margin information in favor of high margin information that was demonstrably less probative of current conditions." *Rhone Poulenc,* 8 Fed. Cir. (T) at 67, 899 F.2d at 1190. A BIA margin is punitive where the ITA uses the high margin information in this situation. *Id.*

---

6. At oral argument, the Attorney–Advisor from the Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, es-

timated that less than one percent (1%) of antidumping cases involve a single exporter.

█ The "current conditions" of the First Administrative Review, however, were quite different from those conditions that existed when the original antidumping duty order was entered. Commerce did use the low margin information in the original order because it was demonstrably probative of the conditions at that time based on Tupy's cooperation with the investigation. Here, Commerce has found that the higher margins[7] are demonstrably more probative of current conditions than the lower margin based in part on the adverse inference discussed above. Further, there is evidence in the record, submitted by petitioners, that conditions were different from the initial order because imports of Tupy's product from Brazil had more than doubled in volume. Pub. Ad.Rec. at Fiche 2, Fr. 2. Accordingly, Commerce did not act in a punitive fashion in its choice of BIA.

### 6

### Commerce Acted In Accordance With The Law When It Chose Not To Adjust The Original LTFV Margin Upward To Account For The Appreciation Of Brazil's Currency Since 1985

Commerce considered adjusting the original LTFV margin upward to account for the appreciation of Brazil's currency since 1985, but rejected that option because there was limited information on the record to support a selection of BIA based upon adjustment of Tupy's LTFV margin for currency fluctuations. *Final Results*, 60 Fed.Reg. at 41,878. Commerce was within its discretion in determining that the use of petition-based information was more appropriate for BIA. The role of this Court in examining determinations by Commerce is to determine whether Commerce's decision is supported by substantial evidence in the record and is in accordance with the law. As Tupy admits, Commerce must determine BIA on a case-by-case basis. Tupy's Reply at 16; *see Manifattura Emmepi S.p.A. v. United States*, 16 CIT 619, 623, 799 F.Supp. 110, 114 (1992). It has done so here.

### D

### This Case Is Also Dismissed Under The Doctrine Of *De Minimis Non Curat Lex*

In refusing to respond to the ITA's questionnaire, Tupy stated that "... the potential benefits derived from [our] **insignificant exports** to the United States do not justify the time and expense related to compiling the information and completing the questionnaire." Pub.Ad.Rec. at Fiche 5, Fr. 26 (emphasis added). If Tupy's exports were truly insignificant, then its very presence here is a *non sequitur*, and accordingly, Plaintiff's Motion is also denied and this case dismissed based upon the doctrine of *de minimis non curat lex*.

█ That doctrine holds that "[t]he law does not care for, or take notice of, very small or trifling matters." Black's Law Dictionary 431 (6th ed. 1990); *see Washington Red Raspberry Commission, et al. v. United States, et al.*, 7 Fed.Cir. (T) 1, 859 F.2d 898 (1988).

In *Washington Red Raspberry*, the Court of Appeals for the Federal Circuit ("CAFC") affirmed the Court of International Trade's decision sustaining the ITA's application of the *de minimis* rule which excluded a foreign exporter from an antidumping duty order because the foreign exporter's dumping margin was negligible. 7 Fed.Cir. (T) at 7, 9, 859 F.2d at 904, 905. In discussing the *de minimis* rule, the CAFC stated "[t]he de minimis concept is well-established in federal law. Federal courts and administrative agencies repeatedly have applied the de minimis principle in interpreting statutes, even when Congress failed explicitly to provide for the rule." *Id.* at 6, 859 F.2d at 902–903.

█ In a footnote, the CAFC pointed to § 132 of the Internal Revenue Code of 1986 which "defines de minimis benefits as those that are so small as to make accounting for them unreasonable or administratively impracticable." *Id.* at ftnt 23 (*citing* 26 U.S.C. § 132(e)(1)). At oral argument, held on June 12, 1996 in New York, Plaintiff's counsel,

---

**7.** At oral argument, counsel for the government correctly pointed out that Commerce used the simple average of the rates alleged in the petition, not the highest rate that was alleged.

Philip Simons, who wrote the letter of October 31, 1994 to Commerce, specifically agreed that "... given the insignificant amount of exports, that accounting for them was unreasonable or at least administratively impracticable."

At oral argument, Plaintiffs failed to demonstrate that their imports into the United States which were so "insignificant" as to not be worth the effort to respond to the ITA's questionnaire, were significant enough to justify the filing of this suit. Based on Plaintiffs' assertion that its transactions are "insignificant", in addition to the reasons set forth above, the Court also dismisses their Complaint [8] pursuant to the long stated proposition that it should not bother with trifles.

## IV

### CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' Motion for Judgment upon the Agency Record and Judgment upon the Agency Record is entered in favor of the United States.

### JUDGMENT

This case having come before the Court for decision, and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED, ADJUDGED AND DECREED that Plaintiff's Motion For Judgment Upon The Agency Record be, and hereby is, denied; and it is further

ORDERED, ADJUDGED and DECREED that the Final Results of Administrative Review issued by the U.S. Department of Commerce in *Certain Malleable Cast Iron Pipe Fittings from Brazil*, 60 Fed.Reg. 41,876 (August 14, 1995) be, and hereby are, sustained; and it is further

ORDERED, ADJUDGED and DECREED that Count II of Plaintiffs' Complaint is voluntarily dismissed; and it is further

ORDERED, ADJUDGED and DECREED that each party shall bear its own costs.

---

8. Count Two is dismissed pursuant to the agreement of the Parties above noted.